STATE of Wisconsin, Plaintiff-Respondent,

v.

Munir A. HAMDAN, Defendant-Appellant.

Supreme Court

*No. 01–0056–CR. Oral argument November 14, 2002.—Decided July 15, 2003.*

2003 WI 113

(Also reported in 665 N.W.2d 785.)

436

For the defendant-appellant there were briefs by *Gordon P. Giampietro, Eric M. McLeod, Amy V. Kossoris* and *Michael Best & Friedrich LLP,* Milwaukee, and oral argument by *Chris J. Trebatoski.*

For the plaintiff-respondent the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. DAVID T. PROSSER, J. This case involves an incident that occurred in the city of Milwaukee on the evening of November 26, 1999. The defendant, Munir Hamdan (Hamdan), owned and operated a grocery store on West Capitol Drive. As time came to close the store, Hamdan removed a handgun that he kept under the counter near the cash register and carried it into a back room for storage. At some point he wrapped the gun in a plastic bag.

¶ 2. While Hamdan was in the back room, two plain clothes Milwaukee police officers entered the store. Hamdan's son pressed a buzzer, summoning his father, and Hamdan shoved the wrapped gun into his trouser pocket and went out to meet the visitors.

¶ 3. The officers explained that they were conducting a license check. Hamdan led one of the officers to a glass-enclosed area where he kept the cash register and showed him the licenses. During the ensuing conversation, the officer asked Hamdan if he kept a gun in the store and, if so, where it was located. Hamdan

answered affirmatively and then pulled the wrapped gun from the front pocket of his trousers. The officers confiscated the gun but did not arrest Hamdan or charge him with an offense.

¶ 4. Hamdan was subsequently charged with carrying a concealed weapon, in violation of Wis. Stat. § 941.23 (1999–2000),[1] and convicted at a jury trial. He appealed his conviction and his case is before this court on bypass of the court of appeals pursuant to Wis. Stat. § (Rule) 809.60.

¶ 5. We are asked to determine what effect, if any, a new amendment to the Wisconsin Constitution has on the State's ability to prosecute and punish the carrying of concealed weapons. The new amendment, Article I, Section 25, declares that the people have the right to keep and bear arms for lawful purposes.[2] While Wis. Stat. § 941.23 (the CCW statute) withstands a facial challenge to its constitutionality under the amendment, *see State v. Cole,* 2003 WI 112, ¶ 27, 264 Wis. 2d 520,

---

[1] Wisconsin Stat. § 941.23 provides: "Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor." A "peace officer" is defined as "any person vested by law with a duty to maintain public order or to make arrests for crime, whether that duty extends to all crimes or is limited to specific crimes." Wis. Stat. § 939.22(22). A Class A misdemeanor is punishable by a fine not to exceed $10,000 or imprisonment not to exceed 9 months, or both. Wis. Stat. § 939.51(3)(a).

All subsequent references to the Wisconsin Statutes are to the 1999–2000 volumes unless otherwise indicated.

[2] Article I, Section 25 of the Wisconsin Constitution provides in its entirety: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."

665 N.W.2d 328, we recognize that there are now circumstances in which a strict application of the CCW statute may result in an unreasonable limitation of the new constitutional right. In Hamdan's case, we must determine whether the constitutional right to keep and bear arms for security or defense permitted Hamdan to carry a concealed weapon in his store under the circumstances of this case, notwithstanding the CCW statute.

¶ 6. We conclude that it was unreasonable and unconstitutional to apply the CCW statute to punish Hamdan on the facts as we understand them. Strict application of the CCW statute effectively disallowed the reasonable exercise of Hamdan's constitutional right to keep and bear arms for the lawful purpose of security. Considering the diminished public interest in applying the CCW statute in the context of Hamdan's conduct, we hold that the State's police power must yield in this case to Hamdan's reasonable exercise of the constitutional right to keep and bear arms for security. This right, when exercised within one's own business and supported by a factual determination that no unlawful purpose motivated concealment of the weapon, will usually provide a constitutional defense to a person who is charged with violating the CCW statute. Because Hamdan was not permitted to assert this defense, his challenge to the CCW statute was not fully addressed by the circuit court and his conviction under Wis. Stat. § 941.23 was not proper.

## I. BACKGROUND FACTS

¶ 7. Munir Hamdan had owned and operated the Capitol Foods grocery and liquor store since 1987. The store was a family-run business, open 365 days a year and operated from 9:00 a.m. until 8:00 or 9:00 p.m., depending on the time of year. Hamdan's wife and

15–year-old son were present in the store on the evening of November 26, 1999. The family had just completed a meal in a back room that functions as a kitchen and dining quarters for family members who congregate and work at the store. It was after 8:00 p.m., the night after Thanksgiving, when the officers came in. The front door of the store was not locked, but Hamdan insisted that he had begun the process of closing up.

¶ 8. This is the contextual information the jury was permitted to hear. Most of Hamdan's proffered evidence was not admitted. *See infra* ¶ 14. For instance, the jury was not told that Hamdan's store is located in a high-crime neighborhood. According to Milwaukee police data, there had been at least three homicides, 24 robberies, and 28 aggravated batteries reported that year in the small census tract that included Hamdan's store.[3] There had been violent criminal episodes both inside and immediately outside Hamdan's store. Between 1993 and 1999, the store was the target of four armed robberies—three of which were successful—and the site of two fatal shootings. Hamdan claims that on one occasion an armed assailant held a gun to his head and actually pulled the trigger. The weapon misfired and Hamdan survived. In February 1997 Hamdan engaged in a struggle with an armed assailant who was attempting to rob the store. In the course of this attack, Hamdan shot and killed the robber in self-defense. The other homicide at the store occurred in April 1998. Incidents of violent crime con-

---

[3] To put this in perspective, the 1990 census tract in which Hamdan's store is located (Census Tract 47) is one of 218 tracts in the city of Milwaukee.

tinued in and around the store after Hamdan's prosecution, including shootings that resulted in bullets striking the store.

¶ 9. As a result of these general and specific concerns for the safety of himself, his family, and his customers, and for the security of his property, Hamdan kept a handgun under the store's front counter next to the cash register during store hours. The jury was not told the basis of Hamdan's motivation for possessing this weapon or that the handgun seized was the same handgun Hamdan used to defend himself from the February 1997 attacker. The jury was told that Hamdan kept the handgun in a locked area closed off from the public and that local law enforcement knew that Hamdan kept a gun for protection.

¶ 10. The jury also learned from the State's only witness, Officer Bodo Gajevic, that "the majority of the store owners [in the area] have some type of weapon on the premises based on my experience." In fact, Officer Gajevic explained that he often checked these weapons to see if they were operating properly.

## II. LITIGATION HISTORY

¶ 11. Six days after being visited by the officers, Hamdan met with an assistant district attorney for Milwaukee County to discuss the incident. After this conference, he was charged with carrying a concealed weapon. Hamdan filed a motion to dismiss the charge, challenging the enforcement of the CCW statute on constitutional grounds. He contended that prior court decisions broadly construing the phrase "goes armed" are no longer valid given the right to keep and bear arms conferred by Article I, Section 25 of the Wisconsin Constitution. Hamdan argued that his prosecution un-

der the CCW statute would impermissibly infringe upon his rights under the newly enacted amendment. Hamdan also contended that no presumption of constitutionality should be accorded the CCW statute because it significantly predated the constitutional amendment.[4]

¶ 12. After the parties had briefed this issue, the circuit court denied Hamdan's motion. Milwaukee County Circuit Judge Robert Crawford concluded that Wisconsin's ban against carrying concealed weapons is not an overly broad infringement of Hamdan's state constitutional right to keep and bear arms. The court reasoned that, as part of the legislature's inherent police power, it could reasonably require that a storeowner openly display a handgun—for instance, by placing it in a holster—if the storeowner kept a handgun for security at his or her place of business.

¶ 13. In preparation for trial, Hamdan and the State submitted competing motions in limine regarding the admission of evidence to support a defense of privilege. The State contended that Hamdan should be prohibited from introducing evidence of crime statistics and prior robberies at the store, as well as Article I, Section 25, arguing that there is no privilege, as a matter of law, under the privilege statute (Wis. Stat. § 939.45) in these circumstances. Hamdan argued to allow such evidence. He theorized that a privilege to carry a concealed weapon—a privilege relating to the defense of property and protection against retail theft or to necessity—was grounded in the new amendment.

---

[4] This court has rejected this argument regarding the presumption of constitutionality in *State v. Cole,* 2003 WI 112, ¶¶ 12–18, 264 Wis. 2d 520, 665 N.W.2d 328, which is also decided today.

Hamdan also submitted a proposed modified jury instruction for jury consideration of these matters.

¶ 14. The circuit court denied Hamdan's motion to admit this evidence. The court determined that there is no statutory privilege under § 939.45 allowing a person to go armed with a concealed weapon no matter what the threats to that person might be. In reaching this conclusion, the court denied that the Wisconsin Constitution supports any common law privilege to carry concealed weapons in certain circumstances. As a result, the evidence was excluded and the final jury instructions contained no mention of Article I, Section 25, the history of crimes in and around Hamdan's store, or any defense of privilege.

¶ 15. After a jury trial on July 11, 2000, Hamdan was found guilty of carrying a concealed weapon. At sentencing, the court noted a need to clarify the reach of state gun laws and also remarked upon the jury's consternation in finding Hamdan guilty for violating the statute in this case. The court ultimately fined Hamdan one dollar. Hamdan sought appellate review, and we granted his petition to bypass the court of appeals.

### III. ISSUES PRESENTED AND STANDARD OF REVIEW

¶ 16. This case, along with the companion case of *Cole,* decided today, represents our first opportunity to interpret Wisconsin's new right to "keep and bear arms."[5] Article I, Section 25 became part of the Wiscon-

---

[5] Article I, Section 25 was previously addressed by this court in *State v. Gonzales,* 2002 WI 59, 253 Wis. 2d 134, 645 N.W.2d 264. However, the sole issue in that case, as ultimately decided by this court, was whether Article I, Section 25 was in

sin Constitution on November 30, 1998. It provides in its entirety: "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."

¶ 17. We are asked to interpret this provision in the context of a challenge to Wisconsin's sweeping prohibition on the carrying of concealed weapons. This prohibition is codified in Wis. Stat. § 941.23 as follows: "Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor."

¶ 18. Hamdan presents three related theories why his conviction under the CCW statute must be reversed. First, he argues that the adoption of Article I, Section 25 requires a new construction of the CCW statute. He contends that, properly construed, the statute no longer reaches his conduct. Second, he argues that the adoption of Article I, Section 25 alters the defense of privilege and gives him a privilege defense on these facts. Third, he argues that his conviction under the CCW statute impairs constitutional rights protected by Article I, Section 25 and cannot stand. All three theories have at their core certain suppositions regarding the effect of the Article I, Section 25 on the CCW statute. The first two theories claim that adoption of the amendment invalidates elements of prior case law interpreting both the CCW statute and its susceptibility to defenses of common law and statutory privilege. Hamdan's third argument is a constitutional assault on the CCW statute based on an alleged need to reconcile the statute with the constitutional right to keep and bear arms.

effect on November 6, 1998, the date when the offense at issue was committed. We determined that it was not applicable at that time. *Id.*, ¶ 30.

¶ 19. These theories present questions of law. Interpretation of the state constitution and interpretation of a state statute are questions of law that this court decides de novo, benefiting from the analysis of the circuit court. *State v. Gonzales,* 2002 WI 59, ¶ 10, 253 Wis. 2d 134, 645 N.W.2d 264.

### IV. STATUTORY INTERPRETATION

¶ 20. To convict a person of carrying a concealed weapon in violation of Wis. Stat. § 941.23, the State must prove three elements. First, the State must show that a person who is not a peace officer went armed with a dangerous weapon. *State v. Dundon,* 226 Wis. 2d 654, 661, 594 N.W.2d 780 (1999) (citing *State v. Asfoor,* 75 Wis. 2d 411, 433–34, 249 N.W.2d 529 (1977)). Second, the State must show that the defendant was aware of the presence of the weapon. *Id.* (citing *Asfoor,* 75 Wis. 2d at 433). Third, the State must show that the weapon was concealed. *Id.* (citing *Mularkey v. State,* 201 Wis. 429, 432, 230 N.W. 76 (1930)). Over the years, every element of the statute has been vigorously litigated.

¶ 21. Hamdan asks the court to withdraw a series of appellate decisions interpreting the first element, which is based on the statutory phrase "goes armed." For more than 70 years, Wisconsin courts have defined the phrase "goes armed" in the CCW statute to mean that "the weapon was on the defendant's person or that the weapon must have been within the defendant's reach and that the defendant was aware of the presence of the weapon." *Asfoor,* 75 Wis. 2d at 433–34 (citing *Mularkey,* 201 Wis. at 432); *see also State v. Fry,* 131 Wis. 2d 153, 183–84, 388 N.W.2d 565 (1986); Wis JI—Criminal 1335.

¶ 22. One of the leading cases in the interpretation of the "goes armed" element is *State v. Keith,* 175 Wis. 2d 75, 498 N.W.2d 865 (Ct. App. 1993). In *Keith,* the court of appeals upheld the CCW conviction of a woman who was carrying a concealed weapon while she was standing on the front porch of the duplex where she was living. *Id.* at 77.[6] Rejecting the defendant's argument that the "goes armed" language requires a finding of locomotion, the court held that "there is no separate element requiring that a person actually *go* somewhere, and, therefore, carrying a concealed weapon 'does not necessarily import the idea of locomotion.' " *Id.* at 79 (quoting 94 C.J.S. Weapons § 8a (1956)).

¶ 23. Hamdan contends that *Keith* was wrongly decided. He argues that the CCW statute's use of the term "goes armed" necessitates a requirement of some locomotion on the part of a defendant. Comparing CCW statutes from other states that merely prohibit "carrying" concealed weapons, Hamdan reasons that the "goes armed" language of Wis. Stat. § 941.23 represents an

---

[6] In *Keith,* police officers came into contact with the defendant after she set off a burglar alarm while trying to gain access to her friend's house where she had been staying. *State v. Keith,* 175 Wis. 2d 75, 77, 498 N.W.2d 865 (Ct. App. 1993). When the officers ran a routine check on her name, they discovered that there were two outstanding warrants for her arrest. *Id.* Keith was arrested and she voluntarily informed the police that she had a gun in her purse. *Id.*

The facts are clear that the defendant did not step out onto the porch from inside the duplex. She was present on the porch after returning from a drive-in theater. *Id.* According to the State's brief, she told police that she had carried the gun in her purse during her evening out because "you know how men are." Thus, the facts underlying the opinion do not make the *Keith* case an ideal vehicle for interpreting a homeowner's right to possess a firearm.

450

implied exception for a person's residence or place of business. Under this view, Hamdan did not "go armed" while carrying his weapon because he never left his own store.

¶ 24. We reject Hamdan's proposed construction of the CCW statute and continue to adhere to prior interpretations of the "goes armed" language. While Hamdan emphasizes definitions of the verb "go" that discuss movement from point to point and the act of departure, other definitions of "go" or "goes" are more germane to the conduct intended to be prohibited. These definitions equate the act of going armed with the state or condition of performing an action.[7] To illustrate, if Hamdan were to come out of the back room without wearing shoes and socks, he could not deny that he was "going" barefoot.

¶ 25. Even if we were to accept "locomotion" as a requirement, we fail to see how Hamdan's act of moving around his store would not be an act of "locomotion" under a common understanding of the term.[8] We would certainly have no problem finding that a customer was "going armed" if the *customer* moved around Hamdan's store with a pistol concealed in his trousers. More problematic is the fact that Hamdan's "locomotion" theory could limit application of the CCW statute in

---

[7] We note the definitions of "go" that include "To pursue a certain course," "To be in a certain condition," and "To continue to be in a certain condition or continue an activity." *The American Heritage Dictionary of The English Language* 775 (3d ed. 1992).

[8] "Locomotion" is defined as: "The act of moving from place to place" or "[t]he ability to move from place to place." *The American Heritage Dictionary of The English Language* 1056 (3d ed. 1992).

public areas where the weapon or the person was not moving. Hamdan contends otherwise. While the concept of locomotion requires movement from place to place, it does not delineate what spatial dimension is required of a "place." Hamdan defines "place" as being a particular structure (namely, one's home or place of business), and he suggests that only movement outside of that structure is "locomotion" or the act of "going." We find no support for this construction of "goes armed" in the text of the statute.

¶ 26. Finally, we note that at least one state with a CCW statute that similarly prohibits a person from "going armed" with a concealed weapon has exceptions for those who carry concealed weapons in their own home or place of business. *See* Iowa Code Ann. §§ 724.4(1), (4)(a) (West 1993). If the concept of going armed precluded application of a CCW law while a person was in or on the person's own property, these exceptions would be superfluous.

■

¶ 27. We decline to adopt a new construction of the CCW statute based on a revised characterization of the phrase "goes armed." We will not rewrite the CCW statute in the troublesome manner Hamdan advocates.[9]

---

[9] Interpreting the "goes armed" language in the manner suggested by Hamdan would, arguably, avoid the constitutional problems with the CCW statute discussed in this opinion. Of course, it is a cardinal rule that courts should avoid interpreting a statute in a way that would render it unconstitutional when a reasonable interpretation exists that would render the legislation constitutional. *See Am. Family Mut. Ins. Co. v. Wis. Dep't of Revenue*, 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998). However, the prerequisite of this rule is that the second possible interpretation is reasonable. We do not find Hamdan's offered

¶ 28. During the time that Hamdan came from the back room and engaged in conversation with the police officers, he was going armed with a concealed and dangerous weapon. Because the jury concluded that Hamdan was aware of the weapon's presence and that the weapon was hidden or concealed from ordinary view, we conclude that Hamdan violated the CCW statute.

## V. DEFENSE OF PRIVILEGE

¶ 29. Hamdan's second argument is that his conduct was privileged under Wis. Stat. § 939.45(1), (2), and (6). Hamdan maintains that this court's holdings in *State v. Dundon,* 226 Wis. 2d 654, 594 N.W.2d 780 (1999), and *State v. Nollie,* 2002 WI 4, 249 Wis. 2d 538, 638 N.W.2d 280, which significantly limited the defense of privilege for CCW offenses, are now suspect by virtue of the adoption of Article I, Section 25.

¶ 30. Hamdan's reliance on § 939.45(1) and (2) clearly fails. Wisconsin Stat. § 939.45(1) permits a defendant charged with a crime a defense of privilege "[w]hen the actor's conduct occurs under circumstances of . . . necessity so as to be privileged under s. . . . 939.47." Wis. Stat. § 939.45(1).[10] Hamdan claims that

interpretation to be reasonable; therefore, it cannot be used to cure a possible constitutional defect in the statute.

[10] Wisconsin Stat. § 939.47 provides:

> Pressure of natural physical forces which causes the actor reasonably to believe that his or her act is the only means of preventing imminent public disaster, or imminent death or great bodily harm to the actor or another and which causes him or her so to act, is a defense to a prosecution for any crime based on that

453

the unpredictable nature of violence in the neighborhood immediately surrounding his store subjects him and his family to risks that make it necessary for him to keep a concealed weapon in his store. This may be true. However, the defense of necessity, by its plain language, exists only when a defendant acts in response to "natural physical forces," not human forces that pose potential dangers. *See State v. Olsen,* 99 Wis. 2d 572, 576, 299 N.W.2d 632 (Ct. App. 1980); *see also Drane v. State,* 29 Wis. 2d 208, 211 n.4, 138 N.W.2d 273 (1965). The existence of random, albeit frequent, criminal conduct in one's vicinity does not qualify as a "natural physical force" under the law. *See Dundon,* 226 Wis. 2d at 666–67.

¶ 31. Similarly, § 939.45(2), which incorporates by reference the privileges of self-defense, defense of others, defense of property, and protection against retail theft, is not available to Hamdan.[11] In *Nollie,* we refused to recognize a privilege to carry a concealed weapon without satisfying the stringent requirements of statutory self-defense.[12] *Nollie,* 249 Wis. 2d 538,

act, except that if the prosecution is for first-degree intentional homicide, the degree of the crime is reduced to 2nd-degree intentional homicide.

Hamdan relies only on the necessity defense permitted under Wis. Stat. § 939.45(1); he does not advance a defense premised on coercion, which is also recognized under § 939.45(1).

[11] These defenses are located within Wis. Stat. §§ 939.48 and 939.49.

[12] In *Nollie,* the defendant alleged that he took a gun out of the trunk of his car, loaded it, and put it in his waistband when he got out of the car to change his tire in a dangerous neighborhood, because he was worried that four men standing on the corner might try to rob him. *State v. Nollie,* 2002 WI 4,

¶ 27. We held that the defendant's assertions that he was in a high crime neighborhood, that he was in a vulnerable position while changing his tire, and that he was faced with a potential threat (four young men were allegedly nearby, being loud and profane) were insufficient to constitute an imminent and specific threat under the self-defense privilege statute. *Nollie,* 249 Wis. 2d 538, ¶ 23–25.

¶ 32. Hamdan argues that the concerns that inspired him to carry a concealed weapon in his store were specific and imminent, based on his past experiences with crime and the high incidence of crime in the neighborhood, thus making his actions privileged. *Nollie* made it clear, however, that such general assertions are insufficient to support a defense of privilege. As we stated, "To allow an individual ·to claim self-defense under such circumstances would essentially allow anyone walking in a 'high crime neighborhood' to conceal a weapon—a situation that ... would eviscerate the legislature's intent in making carrying a concealed weapon a crime." *Id.,* ¶ 26.[13]

---

¶ 8, 249 Wis. 2d 538, 638 N.W.2d 280. Nollie had been the victim of several crimes in the neighborhood, including an armed robbery in which he had been physically assaulted. *Id.,* ¶ 7. We held that to sustain a claim of self-defense the defendant must show that:

> (1) the defendant had an actual and reasonable belief that there was an actual or imminent unlawful interference with the defendant's person; (2) the defendant had the actual and reasonable belief that the threat or use of force was necessary; and (3) that the defendant used only such threat or force as he actually and reasonably believed was necessary.

*Id.,* ¶ 19 (citing Wis. Stat. § 939.48(1)).

[13] The incident at issue in *Nollie* occurred on April 1, 1999, after the enactment of Article I, Section 25. *Nollie,* 249 Wis. 2d

¶ 33. We have little doubt that the dangers facing Hamdan while operating his store were genuine. However, he did not face specific and imminent threats on the night of November 26, 1999, merely because of the location of his store in a high-crime neighborhood and his past victimization by criminal activity. The statutory elements of sections 939.48 and 939.49 contemplate the actual presence of an unlawful interference, which was absent in this case.[14]

¶ 34. Finally, Hamdan relies upon § 939.45(6), which provides for a defense when "the actor's conduct is privileged by the statutory or common law of this state." He asserts either a common law privilege, such as the one this court recognized in *State v. Coleman*, 206 Wis. 2d 199, 556 N.W.2d 701 (1996),[15] or a "statutory" privilege based upon Article I, Section 25.

538, ¶ 3. However, no constitutional argument was raised by the parties and, thus, there was no discussion of the amendment's effect on the statutory privilege of self-defense relative to the CCW statute.

[14] We need not speculate on the possible factual circumstances under which the offense of carrying of a concealed weapon would justify a privilege defense under § 939.45. *See Nollie,* 249 Wis. 2d 538, ¶ 21. We merely note that the facts of Hamdan's case are not amenable to any defense of privilege under Wis. Stat. § 939.45.

[15] The defendant in *Coleman* was arrested as a felon in possession of a firearm, contrary to Wis. Stat. § 941.29(2), when police discovered him with a firearm subsequent to a raid on his girlfriend's apartment. *State v. Coleman,* 206 Wis. 2d 199, 204, 556 N.W.2d 701 (1996). The defendant claimed that on a prior occasion armed robbers invaded the apartment and the defendant had escaped through the window to call the police. *Id.* The defendant argued that, when the police came through the door on the day of his arrest, he believed that history was repeating itself and so he grabbed a gun in self-defense. *Id.* The court held that Coleman was privileged in his actions. *Id.* at 210.

¶ 35. In *Coleman* we recognized a narrow common law privilege to the crime of being a felon in possession of a firearm. This privilege requires a defendant to prove multiple factors. *Coleman*, 206 Wis. 2d at 210–211.[16] However, in *Dundon*, 226 Wis. 2d at 671, we declined to apply the *Coleman* test to the crime of carrying a concealed weapon. In *Dundon*, the manager of a gas station was arrested for carrying a concealed weapon after he placed a handgun in his waistband while transporting money from his station to a bank. *Id.* at 657–58. The defendant asserted that he was privileged to carry a concealed weapon based upon his prior experiences as a victim of assault. The court declined to link the privilege under *Coleman* to the crime of carrying a concealed weapon or to find any common law privilege to CCW offenses. *Id.* at 677. In doing so, we noted that, in 1878, the legislature re-

---

[16] The *Coleman* test for a defendant wishing to invoke the common law privilege for felons in possession of a firearm is:

> [t]he defendant must prove: (1) the defendant was under an unlawful, present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury, or the defendant reasonably believes he or she is under such a threat; (2) the defendant did not recklessly or negligently place himself or herself in a situation in which it was probable that he or she would be forced to possess a firearm; (3) the defendant had no reasonable, legal alternative to possessing a firearm, or reasonably believed that he or she had no alternative; in other words, the defendant did not have a chance to refuse to possess the firearm and also to avoid the threatened harm, or reasonably believed that he or she did not have such a chance; (4) a direct causal relationship may be reasonably anticipated between possessing the firearm and the avoidance of the threatened harm; (5) the defendant did not possess the firearm for any longer than reasonably necessary.

*Coleman*, 206 Wis. 2d at 210–211.

pealed the exact type of privilege sought by Dundon. *Id.* at 671–72. It is now recognized that the holding in *Dundon* forecloses application of the *Coleman* privilege to CCW offenses. *See Nollie,* 249 Wis. 2d 538, ¶ 18. The adoption of a constitutional amendment recognizing the right to keep and bear arms does not affect the soundness of the preceding analysis.

¶ 36. Notwithstanding the absence of a common law privilege, Hamdan maintains that Article I, Section 25 provides a basis in law to support a "statutory" privilege. If we assumed that the Wisconsin Constitution could serve as the basis for a "statutory" privilege under § 939.45(6), we would still conclude that the constitution would have to spell out the scope of the privilege—the nexus between the privilege and the specific criminal conduct—to be applicable. Article I, Section 25 recognizes a right to keep and bear arms generally, but it does not express a privilege to exercise that right in a particular manner or particular circumstance. These are essential attributes of a statutory privilege. Article I, Section 25 does not create a "statutory" privilege to the crime of carrying a concealed weapon.

¶ 37. Under the facts of this case and in the context of the CCW statute, we do not believe that modifying the principles underlying the law of privilege, as codified in Wis. Stat. § 939.45 and interpreted in prior decisions of this court, is the appropriate method of effectuating the rights guaranteed under Wisconsin's right to keep and bear arms amendment.

## VI. CONSTITUTIONALITY "AS APPLIED"

¶ 38. The adoption of Article I, Section 25 did not affect prior judicial interpretations of the CCW statute

or the availability of privilege defenses for CCW crimes, but it did create an obligation to protect rights guaranteed by the amendment.

¶ 39. The State's broad police power to regulate the ownership and use of firearms and other weapons continues, notwithstanding Article I, Section 25. Nonetheless, the amendment's broad declaration of the right to keep and bear arms inevitably impacts the exercise of that power. In this state, constitutional rights do not expand the police power; they restrict the police power. *See Buse v. Smith,* 74 Wis. 2d 550, 564, 247 N.W.2d 141 (1976); *see also* Robert Dowlut & Janet A. Knoop, *State Constitutions and The Right to Keep and Bear Arms,* 7 Okla. City U. L. Rev 177, 185 (1982) (describing the general application of this principle). Thus, courts may limit the broad application of the CCW statute in those circumstances where limitation is necessary to narrowly accommodate the constitutional right to keep and bear arms for lawful purposes.[17]

¶ 40. The nature of this limitation is well established. Faced with similar challenges, other states applying a reasonableness standard in the context of regulating firearms have recognized that "[t]he police power cannot [ ] be invoked in such a manner that it amounts to the *destruction* of the right to bear arms." *State v. McAdams,* 714 P.2d 1236, 1237 (Wyo. 1986)

---

[17] *See Arnold v. Cleveland,* 616 N.E.2d 163, 173 (Ohio 1993) ("[There] must be some limitation on the right to bear arms to maintain an orderly and safe society while, at the same time, moderating restrictions on the right so as to allow for the practical availability of certain firearms for purposes of hunting, recreational use and protection.").

459

(emphasis added).[18] Some states have employed language less demanding than "destruction," assuring that "regulations or restrictions [on a constitutional right to bear arms for defensive purposes] do not *frustrate* the guarantees of the constitutional provision." *City of Princeton v. Buckner,* 377 S.E.2d 139, 145 (W. Va. 1988) (emphasis added);[19] *see also State v. Kessler,* 614 P.2d 94, 99 (Or. 1980) (stating that regulations restricting the

---

[18] *See also Haile v. State,* 38 Ark. 564, 564 (1882) (holding that the legislature may regulate the mode of carrying any arms that the citizens have the constitutional right to keep and bear as long as it is done "in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarass [sic] its exercise"); *Trinen v. City & County of Denver,* 53 P.2d 754, 757 (Colo. Ct. App. 2002) ("A city or state may not, in the name of police power, enact legislation that renders constitutional provisions nugatory.") (citing *People v. Blue,* 544 P.2d 385 (Colo. 1975)); *People v. Brown,* 235 N.W. 245, 246–47 (Mich. 1931) (holding that police power to regulate weapons is "subject to the limitation that its exercise be reasonable, and it cannot constitutionally result in the prohibition of the possession of those arms which, by the common opinion and usage of law-abiding people, are proper and legitimate to be kept upon private premises for the protection of person and property"); *State v. Wilforth,* 74 Mo. 528, 530 (1881); *State v. Comeau,* 448 N.W.2d 595, 598 (Neb. 1989); *State v. Dawson,* 159 S.E.2d 1, 11 (N.C. 1968) ("any statute or construction of a common-law rule, which would amount to a destruction of the right to bear arms would be unconstitutional"); *State v. Ricehill,* 415 N.W.2d 481, 483 (N.D. 1987) (state constitution's protection of the right to keep and bear arms, while not absolute and subject to reasonable regulation under the State's police power, "prevents the negation of the right to keep and bear arms").

[19] The *Buckner* opinion also described the reasonableness of any impairment of the right to bear arms by stating that "the legitimate governmental purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the

460

possession or manner of carrying personal weapons are valid "if the aim of public safety does not frustrate the guarantees of the state constitution"); *State v. Boyce,* 658 P.2d 577, 579 (Or. Ct. App. 1983) (holding that a limitation on the right to bear arms is permissible when the means chosen to protect the public "do[es] not unreasonably interfere with the right"). Case law reveals that while the right to bear arms for lawful purposes is not an absolute, neither is the State's police power when it eviscerates this constitutionally protected right.

¶ 41. Article I, Section 25 does not establish an unfettered right to bear arms. Clearly, the State retains the power to impose reasonable regulations on weapons, including a general prohibition on the carrying of concealed weapons. However, the State may not apply these regulations in situations that functionally disallow the exercise of the rights conferred under Article I, Section 25. The State must be especially vigilant in circumstances where a person's need to exercise the right is the most pronounced. If the State applies reasonable laws in circumstances that unreasonably impair the right to keep and bear arms, the State's police power must yield in those circumstances to the exercise of the right. The prohibition of conduct that is indispensable to the right to keep (possess) or bear (carry) arms for lawful purposes will not be sustained.

¶ 42. Hamdan insists that enforcement of the CCW statute on the facts of his case unreasonably impaired his constitutional rights. He contends that,

exercise of this right where the governmental purpose can be more narrowly achieved." *State v. Buckner,* 377 S.E.2d 139, 146 (W. Va. 1988).

even if the CCW statute technically prohibited his conduct and even if his conduct was not privileged, it was still unconstitutional to apply the statute in the circumstances of his case. Hamdan argues that the right to bear arms provision guarantees, at a minimum, the right to carry a concealed weapon on one's own business property for defense or security when there is a compelling need to do so. The State, on the other hand, maintains that the addition of Article I, Section 25 has had little, if any, impact on the constitutional validity of applying the CCW statute. It argues that while Hamdan may have the right to possess a weapon in his store for the lawful purposes of security and defense, he must continue to possess that weapon openly.

¶ 43. We assess the merits of Hamdan's "as applied" challenge by considering the facts of his case, not hypothetical facts in other situations. *See State v. Stevenson,* 2000 WI 71, ¶ 12, 236 Wis. 2d 86, 613 N.W.2d 90; *State v. Janssen,* 219 Wis. 2d 362, 371, 580 N.W.2d 260 (1998). The State prosecuted Hamdan for carrying a handgun in his trousers pocket, in his own small store, at the time he did, and around the persons he did. The issue is whether the State may restrict the carrying of a concealed firearm in these circumstances without unreasonably infringing Hamdan's rights under Article I, Section 25.

¶ 44. As we explained in *Cole,* when an exercise of the State's police power implicates the constitutional right to keep and bear arms, the validity of the exercise is measured by the reasonableness of the restriction on the asserted right. *Cole,* 264 Wis. 2d 520, ¶ 26 (citing Jeffrey Monks, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin*

462

*Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 275 n.147). This same analytical approach guides judicial determination of whether a particular application of an otherwise reasonable restriction on the right to bear arms is still constitutionally valid.

¶ 45. In analyzing reasonableness, one must balance the conflicting rights of an individual to keep and bear arms for lawful purposes against the authority of the State to exercise its police power to protect the health, safety, and welfare of its citizens. *See Dano v. Collins,* 802 P.2d 1021, 1024 (Ariz. Ct. App. 1990); *People v. Blue,* 544 P.2d 385, 390–91 (Colo. 1975); *Rawlings v. Ill. Dep't of Law Enforcement,* 391 N.E.2d 758, 763 (Ill. Ct. App. 1979) (balancing the sufficiency of the individual's interest in possessing arms with the legislation restricting exercise of that interest); *City of Seattle v. Montana,* 919 P.2d 1218, 1224 (Wash. 1996); *Buckner,* 377 S.E.2d at 148–49; *see also* Michael D. Ridberg, *The Impact of State Constitutional Right to Bear Arms Provisions on State Gun Control Legislation,* 38 U. Chic. L. Rev. 185, 202–03 (1970) ("The scope of permissible regulation in states with arms provisions is dependent upon a balancing of the public benefit to be derived from the regulation against the degree to which it frustrates the purposes of the provision."). In *State v. McAdams,* 714 P.2d 1236 (Wyo. 1986), the Wyoming Supreme Court explained this need for balance as follows:

> [A] balance must be struck between the individual's right to exercise each constitutional guarantee and society's right to enact laws which will ensure some semblance of order. As these interests will necessarily conflict, the question then becomes which party should

> accept the encroachment of its right. The solution to the conflict is judicial in nature. Courts must be and are, whether willingly or not, the ultimate arbiters as to whether or not there is, in a particular case, an unwarranted invasion of constitutionally guaranteed rights.

*Id.* at 1237–38. We agree with this characterization of the constitutional inquiry, including the indispensable role of courts in determining whether enforcement of the CCW statute has unreasonably impaired the constitutional right.

■

¶ 46. Under its broad police power, Wisconsin may regulate firearms. It may regulate the time, place, and manner in which firearms are possessed and used. The concealed weapons statute is a restriction on the *manner* in which firearms are possessed and used. *See State v. Perez,* 2001 WI 79, 244 Wis. 2d 582, 628 N.W.2d 820. It is constitutional. We hold that only if the public benefit in this exercise of the police power is substantially outweighed by an individual's need to conceal a weapon in the exercise of the right to bear arms will an otherwise valid restriction on that right be unconstitutional as applied.

¶ 47. We begin by examining the manner in which the State prohibits the carrying of concealed weapons and whether its reasons for doing so are strong in the context of Hamdan's conduct. This inspection will reveal the comparative burden the CCW statute imposes upon the rights declared in Article I, Section 25.

¶ 48. Wisconsin's current CCW statute is very broad. It is essentially a strict liability offense.[20] The legislature has not authorized any statutory defenses or exceptions (other than peace officers) to the broad prohibition found in the statute. As presently construed, the statute prohibits any person, except a peace officer, from carrying a concealed weapon, regardless of the circumstances, including pursuit of one of the lawful purposes enumerated in Article I, Section 25. In addition, the statute reaches unloaded firearms as well as loaded ones, *see* Wis. Stat. § 939.22(10) (defining a "dangerous weapon" under the CCW statute), and applies to any weapon within a individual's reach, *see Asfoor,* 75 Wis. 2d at 433–34, if the person knows the weapon is present.

¶ 49. The breadth of § 941.23 is better appreciated by comparing it with the law in other jurisdictions. In 1998 Wisconsin joined 43 other states that have established a constitutional right to bear arms.[21] How-

---

[20] The only *mens rea* element of the offense is that the defendant must be aware of the weapon's presence. *See State v. Nollie,* 2002 WI 4, ¶ 13 n.3, 249 Wis. 2d 538, 638 N.W.2d 280.

[21] *Compare* Ala. Const. art. I, § 26; Alaska Const. art. I, § 19; Ariz. Const. art. II, § 26; Ark. Const. art. II, § 5; Colo. Const. art. II, § 13; Conn. Const. art. I, § 15; Del. Const. art. I, § 20; Fla. Const. art. I, § 8(a); Ga. Const. art. I, § 1, para. VIII; Haw. Const. art. I, § 17; Idaho Const. art. I, § 11; Ill. Const. art. I, § 22; Ind. Const. art. I, § 32; Kan. Const. Bill of Rights, § 4; Ky. Const. Bill of Rights § 1, para. 7; La. Const. art. I, § 11; Me. Const. art. I, § 16; Mass. Const. Part the First, art. xvii; Mich. Const. art. I, § 6; Miss. Const. art. III, § 12; Mo. Const. art. I, § 23; Mont. Const. art. II, § 12; Neb. Const. art. I, § 1; Nev. Const. art. I, § 11(1); N.H. Const. art. Part First, art. 2-a; N.M. Const. art. II, § 6; N.C. Const. art. I, § 30; N.D. Const. art. I, § 1; Ohio Const. art. I, § 4; Okla. Const. art. II, § 26; Or. Const. art.

ever, Wisconsin remains one of only six states that generally disallow any class of ordinary citizens to lawfully carry concealed weapons. *See* J. Harvie Wilkinson III, *Federalism for the Future,* 74 S. Cal. L. Rev. 523, 525 n.4 (2001).[22] Each of the five other states (Illinois,

---

I, § 27; Pa. Const. art. I, § 21; R.I. Const. art. I, § 22; S.C. Const. art. I, § 20; S.D. Const. art. VI, § 24; Tenn. Const. art. I, § 26; Tex. Const. art. I, § 23; Utah Const. art. I, § 6; Vt. Const. ch. I, art. 16; Va. Const. art. I, § 13; Wash. Const. art. I, § 24; W. Va. Const. art. III, § 22; Wyo. Const. art. I, § 24.

As of 2002, six states do not have a constitutional provision affording residents a right to bear arms: California, Iowa, Maryland, Minnesota, New Jersey, and New York.

[22] In addition to Wisconsin, the only other states that disallow the opportunity to obtain permits to lawfully carry concealed weapons are Illinois (720 Ill. Comp. Stat. 5/24–1 (2000)), Missouri (Mo. Rev. Stat. § 571.030 (West 1995)), Nebraska (Neb. Rev. Stat. § 28–1202 (1995)), Kansas (Kan. Stat. Ann. § 21–4201 (1995)), and Ohio (Ohio Rev. Code Ann. § 2923.12 (West 1997)). Wilkinson includes the District of Columbia in his list of jurisdictions, along with New Mexico.

New Mexico recently enacted a concealed carry permitting system. *See* 2003 N.M. S.B. 23. However, even before this permitting was allowed, New Mexico's concealed carry prohibition exempted violations of the law in certain circumstances. *See* N.M. Stat. Ann. § 30-7-2(A)(1) (Michie Supp. 2002) (stating that it is not unlawful to carry a concealed loaded firearm "in the person's residence or on real property belonging to him as owner, lessee, tenant or licensee").

Vermont does not have a statute expressly authorizing the carrying of concealed weapons, but the Vermont Supreme Court has expansively read the state's right to bear arms amendment, Chapter I, Article 16 of the Vermont Constitution, as requiring the ability to carry concealed firearms. *State v. Rosenthal,* 55 A. 610, 610 (Vt. 1903). Vermont currently prohibits both the open and concealed carrying of a weapon only if an individual has

Kansas, Missouri, Nebraska, and Ohio) also has a constitutional provision granting the right to keep and bear arms.

¶ 50. Upon closer examination, however, there are few similarities between Wisconsin's CCW law and the CCW laws of these other five states. First, the Kansas right to bear arms amendment is one of only two state right to bear arms provisions that has been interpreted to confer a collective right, as opposed to an individual right, to bear arms.[23] Under such an interpretation, there would appear to be no constitutional impediment to a comprehensive CCW prohibition. In each of the other four "no-permit" states with a right to bear arms amendment,[24] Hamdan's conduct likely

"the intent or avowed purpose of injuring a fellow man." Vt. Stat. Ann. tit. 13, § 4003 (1998).

[23] Some commentators suggest that the Kansas right to bear arms provision was construed to confer an individual right to bear arms in *Junction City v. Mevis,* 601 P.2d 1145 (Kan. 1979). *See* David B. Kopel, *What State Constitutions Teach About the Second Amendment,* 29 N. Ky. L Rev. 823, 846–847 (2002) (discussing how Kansas and Massachusetts are the only two states to have interpreted their state constitution right to bear arms provisions as only a collective right).

[24] Unlike the other four states, only Illinois' right to bear arms provision does not enumerate, in some manner, defense and security as a purpose for which people may bear arms. *See* Ill. Const. art. I, § 22 ("Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."); Kan. Const. Bill of Rights, § 4 ("The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be tolerated, and the military shall be in strict subordination to the civil power."); Mo. Const. art. I, § 23 ("That the right of every citizen to keep and bear arms in defense of his home, person and property, or when lawfully summoned in aid

467

would have been exempted from punishment. For example, in Ohio, the state's CCW statute contains broad affirmative defenses, including the right of business owners and homeowners to lawfully carry a concealed weapon in certain circumstances. Ohio Rev. Code Ann. § 2923.12(C) (West 1997).[25] Similar defenses are pro-

of the civil power, shall not be questioned; but this shall not justify the wearing of concealed weapons."); Neb. Const. art. I, § 1 ("All persons are by nature free and independent, and have certain inherent and inalienable rights; among these are . . . the right to keep and bear arms for security or defense of self, family, home, and others, and for lawful common defense, hunting, recreational use, and all other lawful purposes, and such rights shall not be denied or infringed by the state or any subdivision thereof."); Ohio Const. art. I, § 4 ("The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power."). Only the Missouri constitutional provision expressly reserves for the state the restriction on carrying concealed weapons.

[25] The Ohio statute provides:

(C) It is an affirmative defense to a charge under this section of carrying or having control of a weapon other than dangerous ordnance, that the actor was not otherwise prohibited by law from having the weapon, and that any of the following apply:

(1) The weapon was carried or kept ready at hand by the actor for defensive purposes, *while the actor was engaged in* or was going to or from *the actor's lawful business or occupation, which business or occupation was of such character or was necessarily carried on in such manner or at such a time or place as to render the actor particularly susceptible to criminal attack, such as would justify a prudent person in going armed.*

(2) The weapon was carried or kept ready at hand by the actor for defensive purposes, while the actor was engaged in a lawful activity and had reasonable cause to fear a criminal attack upon the actor or a member of the actor's family, or upon the actor's home, such as would justify a prudent person in going armed.

468

vided in the other three states (Illinois, Missouri, and Nebraska) that do not presently have concealed carry permit laws.[26]

---

(3) The weapon was carried or kept ready at hand by the actor for any lawful purpose and while in the actor's own home.

Ohio Rev. Code Ann. § 2923.12(C) (West 1997) (emphasis added).

[26] *See* 720 Ill. Comp. Stat. 5/24–1(a)(4) (2000) (excepting persons "when on his land or in his own abode or fixed place of business" from prohibition of "carr[ying] or possess[ing] in any vehicle or concealed on or about his person . . . any pistol, revolver, stun gun or taser or other firearm"); Mo. Rev. Stat. § 571.030.3 (West 1995) ("[State concealed weapon prohibition] does not apply when the actor . . . is in his dwelling unit or upon business premises over which the actor has possession, authority or control, . . . ."); Neb. Rev. Stat. § 28–1202(2) (1995) ("It shall be an affirmative defense [to carrying a concealed weapon] that the defendant was engaged in any lawful business, calling, or employment at the time he or she was carrying any weapon or weapons and the circumstances in which such person was placed at the time were such as to justify a prudent person in carrying the weapon or weapons for the defense of his or her person, property, or family.").

Numerous other states also have specific exemptions from prosecution under a carrying a concealed weapon prohibition based on a person being on their own premises. *See, e.g.,* Cal. Penal § 12026 (West 2000); Fla. Stat. ch. 790.25(3)(n) (2002) (*see French v. State,* 279 So.2d 317, 319 (Fla. Dist. Ct. App. 1973), which states that ch. 790.25(3)(n) applies to Fla. Stat. ch. 790.01(2) (Florida's CCW statute)); Ga. Code Ann. § 16–11–126(c) (1999); Iowa Code § 724.4(4)(a) (West 1993); Md. Code, Ann. Crim. Law § 4–203(b)(6) (Michie 2002); Mich. Comp. Laws § 750.227 (Supp. 2002); Minn. Stat. § 624.714(9)(a) (2002); N.C. Gen. Stat. § 14–269(a1)(1) (2001).

To be sure, some state courts have held, usually many years ago, that the offense of carrying a concealed weapon applies even to those on their own premises. *See Dunston v. State,* 27

¶ 51. As a result of our legislature's decision to prohibit the carrying of concealed weapons under any circumstance,[27] the interaction between Wisconsin's CCW statute and the state constitution's right to bear arms is anomalous, if not unique. It appears that no other state, except perhaps Kansas, completely bans the carrying of concealed weapons by all citizens in all circumstances while simultaneously recognizing the right of individuals to own, possess, and carry firearms for lawful purposes. Hence, these other states provide little guidance on the particular issue of whether Hamdan's conduct, which violated the CCW law, may still be constitutionally protected.

¶ 52. We have described Wisconsin's exceptionally restrictive scheme to show how it heightens the conflict between the CCW statute and the rights in Article I, Section 25. The issue is whether and when this conflict requires us to limit the outer reaches of the CCW statute, in order to avoid unreasonable impairments on the right to bear arms.

¶ 53. We turn now to the public benefits underlying the CCW statute and how they apply in the circumstances of this case. As we explained in *Cole,* Wisconsin's prohibition of the carrying of concealed weapons is, as a general matter, a reasonable exercise of the police power, *Cole,* 264 Wis. 2d 520, ¶ 40, and serves many valuable purposes in promoting public safety.

---

So. 333, 334 (Ala. 1900); *Commonwealth v. Puckett,* 125 S.W.2d 1011, 1012 (Ky. 1939); *State v. Nieto,* 130 N.E. 663, 665 (Ohio 1920)(over a vigorous dissent).

[27] The decision over whether to require the permitting of those who wish to carry concealed weapons in any circumstance fully remains with the legislature.

470

¶ 54. In *State v. Walls,* 190 Wis. 2d 65, 526 N.W.2d 765 (Ct. App. 1994), the court of appeals described the inspiration for CCW laws as follows:

> The reason for these statutes, it has been said, is "because persons becoming suddenly angered and having such a weapon in their pocket, would be likely to use it, which in their sober moments they would not have done, and which could not have been done had not the weapon been upon their person."

*Id.* at 71 (quoting from *Williams v. Commonwealth,* 261 S.W.2d 807, 807–08 (Ky. 1953), with citations in *Williams* omitted). In short, carrying a concealed weapon permits a person to act violently on impulse, whether from anger or fear, and that is a prospect the law may discourage.

¶ 55. Another rationale for prohibiting concealed weapons is to put people on notice when they are dealing with an individual who is carrying a dangerous weapon. Notice of the presence of a dangerous weapon permits people, including law enforcement officers, to act accordingly. *See Ross v. State,* 566 S.E.2d 47, 49 (Ga. App. 2002); *Anderson v. State,* 614 A.2d 963, 965 (Md. 1992); 94 C.J.S. *Weapons* § 21 (2001). This objective is perhaps the most significant inspiration for CCW laws. A related concern is that concealed weapons facilitate the commission of crime by creating the appearance of normality and catching people off guard.

¶ 56. One additional rationale for the statute was recognized many years ago when this court stated that CCW laws promote "the preservation of life, by affixing the stigma of the law of the land to him who carries a concealed pistol, loaded or unloaded, except in the cases allowed by the statute." *Mularkey,* 201 Wis. at 431 (quoting from *State v. Bollis,* 19 So. 99, 100 (Miss.

471

1895)). These insightful words are a reminder that one of the purposes of criminalizing conduct is to stigmatize socially malfeasant behavior.

¶ 57. None of these rationales is particularly compelling when applied to a person owning and operating a small store. Although a shopkeeper is not immune from acting on impulse, he or she is less likely to do so in a familiar setting in which the safety and satisfaction of customers is paramount and the liability for mistake is nearly certain. There is less need in these circumstances for innocent customers or visitors to be notified that the owner of a business possesses a weapon. Anyone who enters a business premises, including a person with criminal intent, should presume that the owner possesses a weapon, even if the weapon is not visible.[28] A shopkeeper is not likely to use a concealed weapon to facilitate his own crime of violence in his own store. The stigma of the law is inapplicable when the public expects a shopkeeper to possess a weapon for security.

¶ 58. As one court recently observed, "the criminality of gun possession is mitigated in the two places where an otherwise law-abiding person is likely to spend most of his time and to deserve the greatest expectation of personal security: his home and his workplace." *People v. Buckmire,* 638 N.Y.S.2d 883, 885 (N.Y. Sup. Ct. 1995). We agree.

¶ 59. The purposes of a concealed carry prohibition are often less compelling in settings in which the person bearing the concealed weapon is an owner of the property on which he or she goes armed. Although the

---

[28] *Cf. Beard v. United States,* 158 U.S. 550, 564 (1895) (concluding that a person who is attacked "[i]s entitled to stand his ground, and meet any attack made upon him with a deadly weapon").

considerations discussed above are not determinative of the reasonableness of prohibiting a shopkeeper from carrying a concealed weapon, they weigh against the need for applying the CCW statute in such circumstances if the shopkeeper had a substantial interest in exercising a right under Article I, Section 25.

¶ 60. Strict application of the CCW statute in instances when the public interest in enforcing the statute is weak may unreasonably impair a person's right to keep and bear arms when the person's interest in exercising that right through the use of a concealed weapon is substantial. Our primary concern is examining the CCW prohibition in a circumstance in which the bearing of arms for the purpose of security is the most reasonable and the most necessary.

¶ 61. As alluded to above, many states have recognized, either by case law or statute, a special intersection between the right to bear arms and the protection of one's own property. For example, one state court has held that a citizen enjoys a common law right to carry a concealed weapon in the citizen's own home. *See Gilio v. State,* 33 P.3d 937, 941 (Okla. Civ. App. 2001). Other courts have recognized either a right to conceal weapons in one's own residence (as opposed to "carry" a concealed weapon in one's own premises), *see In re Colby H.,* 766 A.2d 639, 646–50 (Md. Ct. App. 2001), or a more general right to keep weapons in one's home, *see, e.g., Matthews v. State,* 148 N.E.2d 334, 338 (Ind. 1958) (holding that provisions of a state law against carrying of a pistol without a license "do not restrict nor prohibit appellant or any other person from having a pistol in his home or 'fixed place of business' for the defense of himself . . ."). As the Ohio Supreme Court stated, "The right of defense of self, property and family is a fundamental part of our concept of ordered liberty. . . . For

many, the mere possession of a firearm in the home offers a source of security." *Arnold v. Cleveland,* 616 N.E.2d 163, 169–70 (Ohio 1993).

¶ 62. In *State v. Stevens,* 833 P.2d 318 (Or. App. 1992), the Oregon Court of Appeals, in determining that the defendant could not be convicted for carrying a concealed switchblade within his own home, held that the state's CCW statute applies only to the carrying of concealed weapons outside one's own home. *Id.* at 319. The court reached this decision despite the absence of any express exception in Oregon's CCW statute to this effect, *See* Or. Rev. Stat. § 166.240 (2001), and despite Oregon's permit system under which persons may apply to carry a concealed weapon, *see* Or. Rev. Stat. § 166.291 (2001). The court explained two rationales for this conclusion:

> First, the simple act of carrying a concealed switch-blade within one's own home is not the type of unre-strained rights-exercising that "poses a clear threat" to public safety and that can therefore be regulated. Second, the state's interpretation would restrict the manner in which one could carry a legal weapon from room to room within one's home and would inhibit an act that is so intrinsic to ownership and self-defense that it would unreasonably interfere with the exercise of one's constitutional right to possess the switchblade.

*Stevens,* 833 P.2d at 319 (citation omitted). Excepting the reference to switchblades, which are per se illegal under Wisconsin law (Wis. Stat. § 941.24), we adopt Oregon's reasoning, appreciating its resonance in a state where a person has no option for pursuing official permission to lawfully carry a concealed weapon on his or her own premises.

¶ 63. The unreasonableness of applying certain gun regulations when they prohibit sensible conduct on

one's own property is commonly recognized. As explained by one commentator:

> [T]he purpose of statutes prohibiting the carrying of a weapon or the carrying of a concealed weapon except upon one's own premises or at his place of business [is] to allow persons *to defend those areas in which they have a possessory interest,* yet restrict the right to carry weapons to persons in such a position that they are not likely to be thrown into contact with the public and thus perhaps tempted, in a sudden quarrel, to use the weapon to the detriment of another.

Ruby B. Weeks, Annotation, *Scope and Effect of Exception, in Statute Forbidding Carrying of Weapons, as to Person on His Own Premises or at His Place of Business,* 57 A.L.R. 3d 938, § 2(a) (1974) (emphasis added). We also note the following analysis of the reasonableness of place and manner restrictions on the use of firearms, such as prohibitions on carrying concealed weapons:

> [I]t might be argued that these laws impede the purpose of self-defense if they deny an individual the right to carry a weapon when he is most likely to be attacked. This argument is countered by two considerations: the danger of widespread presence of weapons *in public places* and police protection against attack in these places. Thus, in view of the benefit to be derived from these laws, place and manner regulations *which do not restrict possession in homes or businesses* do not seem to subvert unduly the self-defense purpose.

Ridberg, *supra,* at 204 (emphasis added).

¶ 64. The importance of being able to exercise the right to bear arms in the setting of one's own property is implied by the language of Article I, Section 25. The amendment enumerates several lawful purposes for

which one can exercise the right to bear arms.[29] Although Hamdan's conduct could arguably be construed

[29] This court generally examines three sources in determining a constitutional provision's meaning: "the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption." *See Thompson v. Craney,* 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996).

We focus our attention on the plain language of the term "security" because the last two factors are not particularly helpful to ascertaining the intended meaning of the term "security." There is presently no relevant interpretation of Article I, Section 25 that has been provided by the legislature. As to the debates contemporaneous with the passage of the amendment, there is very little discussion as to the meaning of the term "security." In fact, according to one legislative source, it was freely admitted that "[u]nless there is further clarification in the language of the Constitution, courts will be compelled to interpret the term 'security.'" Memorandum from Shaun Hass, Senior Staff Attorney, Wis. Legis. Council, entitled *Analysis of 1995 Assembly Joint Resolution 53 and 1995 Senate Joint Resolution 7, Relating to the Right to Keep and Bear Arms (First Consideration) to Wisconsin State Representative David Travis and Interested Legislators* (Oct. 11, 1995), at 7 (hereinafter the LCS Memo).

Both the 1995 Legislative Council Staff memo and the Legislative Reference Bureau Drafter's Note to the resolution that became the amendment recommended that the meaning of "security" be clarified with additional language in the amendment, but no such clarification was included. *See* 1995 LCS Memo, at 7; Wis. Legis. Reference Bureau, Drafter's Note for 1995 Assemb. Joint Res. 53, at 2, reprinted in Wis. Legis. Reference Bureau, Drafting Record to 1995 Assemb. J. Res. 53. The LCS memo noted that "security" could mean "security of the state" or it could refer to the general security of one's home or business. 1995 LCS Memo, at 7. The authors of these docu-

as undertaken for the purpose of "defense," we think the circumstances logically point to the purpose of "security."

¶ 65. The term "security" is not defined by the amendment, nor is it given any specific meaning elsewhere under Wisconsin law. The relevant legal definition of "security" is "[t]he state of being secure, esp. from danger or attack." *Black's Law Dictionary* 1358 (7th ed. 1999). The applicable definitions of "security" in lay dictionaries are enlightening. Some definitions include: "1. freedom from danger, risk, etc.; safety. . . . 3. something that secures or makes safe; protection; defense. . . . 5. precautions taken to guard against crime, attack, sabotage, espionage, etc." *Random House Unabridged Dictionary* 1731 (2d ed. 1993).[30] Security is also defined as "Something that gives or assures safety, as: . . . c. Measures adopted, *as by a business or homeowner,* to prevent a crime such as burglary or assault[.]" *The American Heritage Dictionary of The English Language* 1632 (3d ed. 1992) (emphasis added).

¶ 66. The common understanding of "security" does not implicate an imminent threat. Rather, it connotes a persistent state of peace. We believe the domain most closely associated with a persistent state

___

ments failed to reach a conclusion regarding what "security" means, with both stating that the meaning would have to be decided by the judiciary. *See* Jeffrey Monks, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 271–72 n.140.

[30] Similarly, "secure" is defined as "1. free from or not exposed to danger or harm; safe. . . . 3. affording safety, as a place[.]" *Random House Unabridged Dictionary* 1731 (2d ed. 1993).

of peace is one's home or residence, followed by other places in which a person has a possessory interest. A person is less likely to rely on public law enforcement for protection in these premises and is more likely to supply his own protection. In fact, a person who takes no initiative to provide security in these private places is essentially leaving security to chance. Firearms ownership has long been permitted in Wisconsin. We infer that the inclusion in the amendment of the right to bear arms for security was intended "to include a personal right to bear arms to protect one's person, family, or property against unlawful injury and to secure from unlawful interruption the enjoyment of life, limb, family, and property," Dowlut & Knoop, *supra,* at 190, subject to reasonable regulation.

¶ 67. Based on the foregoing considerations, we conclude that a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex when undertaken to secure one's home or privately owned business.[31] Conversely, the State's inter-

---

[31] Our decision today recognizes that the reasonableness of enforcing general gun regulations becomes uniquely suspect in certain settings, but Article I, Section 25 does not transform the right to bear arms in these locations into an absolute right.

The State retains the ability regulate gun ownership, use, possession, and transportation of firearms even with respect to matters occurring in one's home or place of business. *See, e.g., Gibson v. State,* 930 P.2d 1300, 1302 (Alaska Ct. App. 1997) (rejecting defendants' as-applied challenge to the constitutionality of their convictions for possessing a firearm while impaired by intoxicating liquor, stating that "[p]eople who handle firearms while intoxicated, even in their own homes, pose a significant threat to the health and safety of their family members, their neighbors and themselves.").

est in prohibiting concealed weapons is least compelling in these circumstances, because application of the CCW statute "has but a tenuous relation to alleviation" of the State's acknowledged interests. *Moore v. East Cleveland,* 431 U.S. 494, 500 (1977) (Powell, J., plurality opinion). As stated recently by the New Hampshire Supreme Court, "If the restriction of a private right is oppressive, while the public welfare is enhanced only [to a] slight degree, the offending statute is void as an invalid exercise of the police power." *Kennedy v. Town of Sunapee,* 784 A.2d 685, 688 (N.H. 2001) (internal quotations omitted). We believe that the CCW statute, by virtue of its application under the facts of this case, suffers from this infirmity.

¶ 68. If the constitutional right to keep and bear arms for security is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence or privately operated business, and to safely move and store weapons within these premises.

¶ 69. In addition to weighing the public interest in enforcing the CCW statute against an individual's interest in exercising the right to keep and bear arms by carrying a concealed weapon, a court must assess whether an individual could have exercised the right in a reasonable, alternative manner that did not violate the statute.

¶ 70. We faced a similar inquiry in *Brandmiller v. Arreola,* 199 Wis. 2d 528, 544 N.W.2d 894 (1996). Applying intermediate scrutiny to an "as applied" constitutional challenge, we stated that, under this level of scrutiny, the test for whether statutes or ordinances that restrict a fundamental right are constitutional is

whether they leave "open ample alternative channels by which the citizen may exercise" the affected right. *Id.* at 541.

■

¶ 71. In circumstances where the State's interest in restricting the right to keep and bear arms is minimal and the private interest in exercising the right is substantial, an individual needs a way to exercise the right without violating the law. We hold, in these circumstances, that regulations limiting a constitutional right to keep and bear arms must leave *some* realistic alternative means to exercise the right.

¶ 72. For instance, in order to keep and bear arms for the purpose of securing one's own property, a weapon must be kept somewhere and may need to be handled or moved, all within the weapon owner's property. During these times, the firearm will be either visible or concealed. The State argues that even under the strictest enforcement of the CCW statute, a person lawfully in possession of a firearm will always retain the ability to keep the firearm in the open—holding the weapon in the open, keeping the weapon in a visible holster, displaying the weapon on the wall,[32] or other-

[32] The State points to *State v. Mata,* 199 Wis. 2d 315, 544 N.W.2d 578 (Ct. App. 1996), as authority for the proposition that there may be some effectiveness to requiring storeowners to openly display handguns they possess. In *Mata,* two tavern owners were charged with carrying a concealed weapon under the CCW statute. *Mata,* 199 Wis. 2d at 318. The court of appeals reversed the circuit court's holding that the exemption for tavern owners under Wis. Stat. § 941.237(3)(d), which permits a tavern owner to go armed with a handgun in the owner's tavern, precluded prosecution of the tavern owner under § 941.23. *Id.* The court held that a tavern owner carrying a handgun is required to openly display the handgun in order to carry it

wise placing the weapon in plain view. Relying on this reasoning, the State quarrels with any legal conclusion that application of the CCW statute to Hamdan in his circumstance rendered his rights illusory.[33] *See, e.g., State v. Nieto,* 130 N.E. 663, 664 (Ohio 1920) ("[CCW] statute does not operate as a prohibition against carrying weapons, but as a regulation of the manner of carrying them. The gist of the offense is the concealment").

¶ 73. We cannot agree. Requiring a storeowner who desires security *on his own business property* to

lawfully under § 941.237(3)(d). *Id.* at 321. The court answered the defendants' argument that this requirement is absurd by a counterargument that openly displaying a handgun may deter crime, while concealment probably would not. *Id.*

In light of Article I, Section 25, this analysis in *Mata* is suspect. It is incomplete because it predates the adoption of Wisconsin's constitutional right to bear arms amendment and, therefore, did not attempt to reconcile the CCW statute with the tavern owner's constitutional right to bear arms for security. The countervailing policy arguments relied on in *Mata* take on a different gloss in the shadow of this provision. We believe, for the reasons expressed in the body of this opinion, that the *Mata* opinion is now incorrect in its assessment of the reasonableness of requiring the open display of guns.

[33] The State selectively recounts the circumstances surrounding Hamdan's CCW conviction to minimize his interests in providing security to his store. According to the State, "Hamdan carried a pistol in his pocket in a retail establishment accessible to the public and continued to do so while he spoke with the police officers who were inspecting his store. The State's interest in enforcing the CCW law is sufficiently great under these circumstances that the requirement that Hamdan carry his gun openly is a modest and reasonable limitation on his right to bear arms, one that survives [] the reasonableness standard . . . ."

carry a gun openly or in a holster is simply not reasonable. Such practices would alert criminals to the presence of the weapon and frighten friends and customers. Likewise, requiring the gun owner to leave a handgun in plain view in his or her store so that he or she avoids a CCW charge fails the litmus test of common sense. We do not think it is necessary to spell out the dangers created by making firearms *more* accessible to children, to assailants, to strangers, and to guests. In fact, leaving a firearm in the open could expose a gun owner to other liability, both criminal and civil. *See* Wis. Stat. §§ 948.55 (prohibiting the leaving of a loaded firearm within the reach or easy access of a child) and 947.01 (prohibiting disorderly conduct).

¶ 74. There is no dispute that most storeowners have the right to possess a firearm. As a practical matter, the storeowner who keeps a firearm for security must have the gun within easy reach. Requiring a storeowner to openly display weapons as the only available means of exercising the right to keep and bear arms for security is impractical, unsettling, and possibly dangerous. If the State prosecutes a storeowner for having a concealed weapon within easy reach, it is strongly discouraging the use of firearms for security and is practically nullifying the right to do so. Such a prosecution is very likely to impair the constitutional right to bear arms for security.[34]

---

[34] In her dissent, the Chief Justice concludes that, in *all* instances, the "right to bear arms 'is not impaired by requiring individuals to carry weapons openly.' " Dissent, ¶ 124 (quoting *Dano v. Collins,* 802 P.2d 1021, 1022–23 (Ariz. Ct. App. 1990)). In reaching this conclusion, she questions this opinion's "views about human psychology." Dissent, ¶ 127–129. The dissent also concludes implicitly, if not explicitly, that no enforcement of the

¶ 75. Overall, we believe that requiring the continuous, open carrying of a firearm in one's business would effectively eviscerate Article I, Section 25 and lead to undesirable consequences. Under the view of the State and the Chief Justice, a storeowner either must sacrifice the exercise of his right to use arms for security or must put himself and others at risk by openly displaying the weapon.

¶ 76. There is a final element to a constitutional challenge of an application of the CCW statute. Article I, Section 25 expressly limits the right to keep and bear arms to "lawful purposes." Therefore, a defendant is not entitled to assert a constitutional defense to a CCW charge if he or she carried a concealed weapon for an unlawful purpose.[35] Carrying a concealed weapon for an unlawful purpose, even if a defendant were able to satisfy the two other tests for an unreasonable restriction, is not protected by the amendment.

¶ 77. Whether a defendant carried a concealed weapon for an unlawful purpose is a question of fact, as it may involve a state of mind for which competing evidence is necessary. This inquiry requires a determi-

---

CCW statute, as presently written, will unreasonably infringe upon a broadly worded constitutional right to keep and bear arms.

Under the CCW statute, it is technically unlawful for a homeowner to conceal a weapon in a nightstand within reach of the homeowner's bed. The law is simply not enforced in this situation, just as it is not enforced in many places when a storekeeper conceals a weapon near a cash register.

[35] *Cf. State v. Schelin,* 55 P.3d 632, 639 (Wash. 2002) (holding that constitutionally protected right to bear firearms in his home ceases when the purpose of bearing firearms is to further the commission of a crime).

nation of the individual's purpose for carrying the concealed weapon. In this inquiry, carrying a concealed weapon for an unlawful purpose means carrying a concealed weapon in furtherance of the commission of a crime.

¶ 78. To overcome a constitutional defense that has been approved by the court, the State has the burden of alleging that a defendant had a specific criminal purpose and of presenting evidence that the defendant carried the concealed weapon for that unlawful purpose. If the court determines that the alleged intent is criminal in nature and if the State meets its burden of producing evidence sufficient to raise the issue of that intent, then the court will instruct the trier of fact to determine if the particular unlawful purpose was actually held by the defendant while he or she carried the concealed weapon. If the trier of fact determines such an allegation to be true, a defendant will be precluded from successfully availing himself or herself of any constitutional challenge to a CCW conviction. If it determines otherwise, then the unconstitutionality of enforcing the CCW statute against the defendant remains, and no further verdict regarding the elements of the CCW offense need be answered.[36]

---

[36] If a court determines as a matter of law that an "as applied" challenge would fail (even assuming that a defendant did not carry a concealed weapon for an unlawful purpose), then there is no need to submit to the trier of fact a question on the defendant's unlawful purpose. While a lawful purpose is a necessary predicate for these challenges, it is not a sufficient condition.

Chief Justice Abrahamson's dissent confuses the role of the inquiry into an unlawful purpose. *See* dissent, ¶ 134–137 & accompanying footnotes. Of course, there will be instances

## VII. APPLICATION OF PRINCIPLES

¶ 79. Having examined the principles involved in an "as applied" challenge to the prosecution of a CCW violation, we now apply those principles to Hamdan's case. We acknowledge that the State proved all three elements of the CCW statute. Hamdan went armed with a dangerous weapon when he carried a gun in his trousers pocket. He was aware of the presence of the weapon. Because the weapon was in his pocket and not visible, it was concealed.

¶ 80. In determining whether, under the circumstances of this case, it was unreasonable for the State to impair Hamdan's right to bear arms by punishing him for carrying a concealed weapon, we reach two legal conclusions.[37]

¶ 81. First, under the circumstances, Hamdan's interests in maintaining a concealed weapon in his

---

when a defendant has multiple purposes for carrying a concealed weapon. The dispositive issue is whether the defendant had *an* unlawful purpose, irrespective of whether he or she had a concurrent lawful purpose. For example, a convicted felon who carries a weapon, concealed or not, for his security *is* acting in furtherance of a crime and may not avail himself of a constitutional defense.

[37] Both the dissent and Justice Crooks' concurrence/dissent consider it odd that we assess the merits of a constitutional challenge as a legal question, versus one of fact. However, this court has previously developed tests for determining whether prosecution of a defendant under an otherwise-valid statute impermissibility infringes upon a constitutionally protected right. For example, in *State v. Miller,* 202 Wis. 2d 56, 549 N.W.2d 235 (1996), we addressed an as applied challenge to a statutory requirement to display a red and orange triangular, slow-moving vehicle emblem on horse-drawn buggies used by members of the Old Order Amish. We stated:

485

store and carrying it personally during an unexpected encounter with visitors substantially outweighed the State's interest in enforcing the concealed weapons statute.

> We will apply the compelling state interest/least restrictive alternative test to our review of this claim that Wis. Stat. § 347.245(1), as applied to the eight Amish respondents, violates freedom of exercise and freedom of conscience under Art. I, § 18 of the Wisconsin Constitution. Succinctly stated, under this analysis, the challenger carries the burden to prove: (1) that he or she has a sincerely held religious belief, (2) that is burdened by application of the state law at issue. Upon such proof, the burden shifts to the State to prove: (3) that the law is based on a compelling state interest, (4) which cannot be served by a less restrictive alternative.

*Id.* at 66. The court treated these as matters to be determined by the court. To be sure, challenges to the state constitutional right to keep and bear arms amendment involve a "reasonable restriction" test and not strict scrutiny, but they are still challenges based on a constitutional right.

Furthermore, as *Miller* itself indicated, the second legal element in the test that we adopt—the issue of whether some reasonable alternative means for exercising the right exists—is a legal question. In *Brandmiller v. Arreola,* 199 Wis. 2d 528, 544 N.W.2d 894 (1996), this court asked whether a cruising ordinance left open ample alternative channels for exercising the right at issue (right to travel) and framed this issue as a legal question that it (this court) resolved.

The Chief Justice also opines that, by addressing Hamdan's constitutional challenge as primarily a legal question, we "turn our precedent on its head" by permitting "a court, not the jury, to reach substantive conclusions about the merits of a defendant's constitutional defense . . . ." Dissent, ¶ 135. The cases that the Chief Justice offers to support this position deal with First Amendment issues of obscenity and "true threats." Dissent, ¶¶ 133–34. In the obscenity cases, courts define the legal parameters of "obscenity," and therefore the constitutional

¶ 82. Hamdan exercised the right to keep and bear arms under circumstances in which the need to exercise this right was substantial. He owned a grocery store in a high crime neighborhood and his store had been the site of past robberies and homicides. Hamdan himself had been a crime victim at the store. Hamdan had concerns not only for himself but also for his family and customers. He had good reason to anticipate future crime problems at the store and a need to provide his own security to deal with the problems. Acting on this need, Hamdan kept a handgun under the counter near the cash register but safely stored the weapon when the business was closed. Hamdan's transport of the weapon in his pocket on the night in question was incidental to his normal safe handling and storage of the firearm in his store. Meanwhile, the State's interests in prohibiting Hamdan from carrying a concealed weapon in his small store, under the circumstances on the night the

limits of the right to free speech. *See Miller v. California,* 413 U.S. 15 (1973). In the context of Wisconsin's constitutional right to bear arms, the issue is not whether a community standard, such as the "prurient interest," is met as a prerequisite to finding "obscenity." Rather, the only issue is the reasonableness of a restriction on the right. Furthermore, with regards to our "true threat" cases, this court has concluded, without submitting the determination to a jury, that a defendant's statement constituted a "true threat" as a matter of law. *State v. A.S.,* 2001 WI 48, ¶¶ 23–25, 243 Wis. 2d 173, 626 N.W.2d 712.

As Justice Bablitch correctly notes in his concurrence, "constitutional facts are determined by the court." Justice Bablitch's concurrence, ¶ 96; *see also State v. Dixon,* 177 Wis. 2d 461, 466–67, 501 N.W.2d 442 (1993) (stating in the Fourth Amendment context that "[w]hether the facts give rise to an individual's reasonable expectation of privacy in the space or area which was the subject of the search is a question of constitutional law which we review independently").

police officers visited his store, were negligible. The police knew that Hamdan's store was a crime target and that Hamdan kept a weapon for protection. There is no evidence that Hamdan was prone to act irresponsibly or impulsively, and he was unlikely to do so in his own store. Therefore, enforcement of the CCW statute on these facts would seriously frustrate the constitutional right to keep and bear arms for security but advance no discernible public interest.

¶ 83. Second, Hamdan had no reasonable means of keeping and handling the weapon in his store except to conceal it. In the normal course of business, Hamdan concealed the weapon in an area that was accessible to him but inaccessible to the public. It would have been dangerous and counterproductive to openly display the weapon during business hours, and requiring him to do so would have seriously impaired his right to bear arms for security. When Hamdan was unexpectedly summoned to come to the front of the store at a time when he was closing up for the night, he had the option of putting the handgun in his pocket or leaving the handgun in the back room without knowing who had come into the store and whether his security was threatened. Carrying the handgun openly when he went back into the store would have shocked his visitors, seriously threatened his safety, and was not a reasonable option.

¶ 84. Because we determine that Hamdan prevails on both of these issues, we conclude that he had a constitutional right to keep and bear arms for the lawful purpose of security at the time he carried his concealed weapon, that his conviction for carrying a concealed weapon was unconstitutional, and his conviction must be reversed. He was never allowed to present this defense. We remand the case to the circuit court for

488

further proceedings consistent with this opinion. The case should be dismissed unless the State can show probable cause that Hamdan had an unlawful purpose when he was carrying the concealed weapon. Hamdan asserted that he was exercising his constitutional right to bear arms for only lawful purposes and, at this time, there is no evidence that Hamdan had any unlawful purpose nor has the State asserted such an intent.

## VIII. COMMENTARY

¶ 85. The approval of a state constitutional right to keep and bear arms for security, defense, hunting, recreation, and any other lawful purpose will present a continuing dilemma for law enforcement until the legislature acts to clarify the law. We urge the legislature to thoughtfully examine Wis. Stat. § 941.23 in the wake of the amendment and to consider the possibility of a licensing or permit system for persons who have a good reason to carry a concealed weapon. We happily concede that the legislature is better able than this court to determine public policy on firearms and other weapons.[38]

¶ 86. In the meantime, we must give effect to the constitutional right embodied in Article I, Section 25.[39] A defendant who challenges on constitutional grounds

---

[38] Justice Crooks would declare Wis. Stat. § 941.23 unconstitutional but delay the effective date of the ruling to permit the legislature to make alterations in the CCW statute. Justice Crooks' concurrence/dissent, ¶ 110. This suggestion is not tenable.

[39] Contrary to assertions in the dissent and Justice Crooks' concurrence/dissent, we have not read exceptions into the CCW statute. See dissent, ¶ 115; Justice Crooks' concurrence/dissent, ¶¶ 100, 101, 107, 113. As explained in Parts IV and V of

a prosecution for carrying a concealed weapon will be required to secure *affirmative* answers to the following legal questions before he or she is entitled to raise a constitutional defense. First, under the circumstances, did the defendant's interest in concealing the weapon to facilitate exercise of his or her right to keep and bear arms substantially outweigh the State's interest in enforcing the concealed weapons statute? The State generally has a significant interest in prohibiting the carrying of concealed weapons. Thus, to satisfy this element, the defendant must have been exercising the right to keep and bear arms under circumstances in which the need to do so was substantial. Second, did the defendant conceal his or her weapon because concealment was the only reasonable means under the circumstances to exercise his or her right to bear arms? Put differently, did the defendant lack a reasonable alternative to concealment, under the circumstances, to exercise his or her constitutional right to bear arms? The invocation of this possible defense must be raised by motion of the defendant before trial, and resolution of these legal questions must be made by the court prior to trial. Affirmative answers to these questions will require a court to conclude that the State's enforcement of the CCW statute constituted an unreasonable and unconstitutional impairment of the right to keep and bear arms as granted in Article I, Section 25 of the Wisconsin Constitution.

---

this opinion, the interpretation of the CCW statute and the statute's relation to statutory privilege defenses remain unchanged by the adoption of Article I, Section 25. Our analysis has merely fleshed out the parameters of the constitutional rights in Article I, Section 25 and has articulated the constitutional defense that protects those rights.

¶ 87. The issue of unlawful purpose is relevant only when the court approves a constitutional defense. The State can overcome a court-approved constitutional defense only if it asserts, and then proves at trial, that the defendant had an unlawful purpose at the time he or she carried the concealed weapon. Whether the defendant had an unlawful purpose, defined as an intent to use the weapon in furtherance of the commission of a crime, is a question of fact. The question should be submitted to the trier of fact along with separate, traditional instructions on the crime of carrying a concealed weapon.

¶ 88. If a jury answers that the defendant did not intend the unlawful purpose specifically alleged by the State, then it will not need to reach the questions posed in the jury instructions for a CCW offense as the defendant's conduct remains constitutionally protected. If any unlawful purpose is proven, then the defendant can be found guilty of carrying a concealed weapon upon proof beyond a reasonable doubt of the elements of the crime of carrying a concealed weapon. *See* Wis JI—Criminal 1335.

¶ 89. These principles should provide some guidance to counsel and the courts until the legislature takes further action.

*By the Court.*—The judgment of the circuit court is reversed and the cause is remanded.

¶ 90. WILLIAM A. BABLITCH, J. *(concurring).* I join the majority opinion and write only to answer Chief Justice Abrahamson's dissent.

¶ 91. Chief Justice Abrahamson's dissent would find Mr. Hamdan guilty, notwithstanding that Mr. Ham-

491

dan carried the gun in his pocket at night, in his own store, located in a high crime neighborhood, which had been the subject of past robberies and homicides, and had himself been the subject of an attempted murder in the store. I could not disagree more.

¶ 92. The Chief Justice's dissent, in its attempt to save the Carrying a Concealed Weapon statute, eviscerates the constitutional amendment. It renders the constitutional amendment a sham by reading into it the words "unless concealed." The inevitable and logical result of that interpretation is to create absurdities neither the legislature nor the voters could have intended.

¶ 93. Based on the Chief Justice's interpretation, it is lawful to have a gun on top of your night table or bureau, but not in a drawer; it is lawful to have a gun case in the home if the guns inside can be seen, but unlawful if the guns are behind a solid door and cannot be seen. With all due respect, that just doesn't make sense.

¶ 94. The majority is absolutely correct in concluding that this could not have been the result intended by the legislators who wrote the constitutional amendment nor the voters who ratified it. The dissent by Justice Crooks, who would find the statute unconstitutional, by implication quite obviously agrees that this could not have been the intent behind the constitutional amendment.

¶ 95. The very difficult task confronted by the majority was to conform the statute to the newly enacted constitutional amendment, if possible. It is well-established that statutes are presumed constitutional; thus, our first responsibility is to preserve the statute if possible. *State v. McManus,* 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989). I conclude that the major-

492

ity did exceedingly well in accomplishing that task, and that is why I join the majority.

¶ 96. The framework set out by the majority for the circuit courts to follow in deciding these very fact-specific cases is not at all unlike the framework these courts have used for decades in deciding 4th Amendment cases, which are themselves very fact-specific. In 4th Amendment cases, the court is confronted with historical facts and constitutional facts. Constitutional facts, i.e., whether the facts are in conformity with the constitutional demands, are determined by applying the historical facts to the constitution, which is a question of law determined by the court. *State v. Jennings*, 2002 WI 44, ¶ 20, 252 Wis. 2d 228, 647 N.W.2d 142. The touchstone is "reasonableness." So too here. The constitutional facts are determined by the court, applying the historical facts to the constitutional amendment, and "reasonableness" is the touchstone. Accordingly, I respectfully disagree with the Chief Justice's dissent and join the majority.

¶ 97. ANN WALSH BRADLEY, J. *(concurring).* I agree with the majority that Hamdan's conviction for carrying a concealed weapon was unconstitutional and his conviction must be reversed. Majority op., ¶ 84. However, I do not join the majority's discussion in Part VIII regarding the procedural aspects of future constitutional challenges to prosecutions for carrying a concealed weapon. *See id.,* ¶¶ 85–88.

¶ 98. I am not convinced that the procedural mechanism created by Part VIII is consistent with established methods of raising constitutional defenses. I am also concerned that some unique aspects of these procedures may prove to be unworkable and create confusion. Accordingly, I respectfully concur.

493

¶ 99. N. PATRICK CROOKS, J. *(concurring/dissenting).* For the reasons set forth below, I respectfully concur/dissent, since I agree with the majority's result that Hamdan's conviction should be reversed, but I dissent on the majority's action in remanding this matter.

¶ 100. The majority in this case improperly reads exceptions into Wis. Stat. § 941.23 in order to hold that it is constitutional. Such exceptions to the statute should not be made by this court, but by the legislature. Looking at the statute itself, I conclude that Wis. Stat. § 941.23 has become unconstitutional with the passage of Article I, Section 25 of the Wisconsin Constitution. I agree with Chief Justice Abrahamson's dissent that the majority erroneously assigns to a court, rather than a jury, the task of determining factual issues involving whether a defense to a charge of carrying a concealed weapon is available to a defendant.

¶ 101. I agree with her dissent that this court should not attempt to engraft exceptions onto Wis. Stat. § 941.23, in order to try to make it conform to constitutional strictures. Chief Justice Abrahamson's dissent, ¶ 115. If the statute does not conform to the Wisconsin Constitution, as amended, then the statute is unconstitutional. *See State v. Zarnke,* 224 Wis. 2d 116, 139–140, 569 N.W.2d 370 (1999); *State v. Hall,* 207 Wis. 2d 54, 82, 557 N.W.2d 778 (1997).

¶ 102. I strongly disagree, however, with Chief Justice Abrahamson's conclusion that the statute survives the constitutional amendment and remains constitutional. In light of Article I, Section 25 of the Wisconsin Constitution, I conclude that Wis. Stat. § 941.23 is unconstitutional because it is unnecessarily broad and rigid now and provides no exceptions as it is written. The statute is not a reasonable exercise of the

state's police power. If the majority were to refrain from attempting to find exceptions in the statute where none exist, it too would presumably find it unconstitutional.

¶ 103. The breadth of the statute is incompatible with the broad constitutional right to bear arms. Its prohibition extends to anyone at any time and, therefore, improperly and unnecessarily impinges on a person's right to bear arms "for security, defense, hunting, recreation or any other lawful purpose."[1] The statute has been held to prohibit a gun placed on the front seat of a car,[2] in a glove compartment,[3] or on a shelf behind the driver's seat.[4] One "goes armed" even when going nowhere with the concealed weapon.[5]

¶ 104. It may be argued that Wis. Stat. § 941.23 withstands the constitutional test, as a reasonable exercise of the state's police power. A state may permissibly exercise its police power in order to promote the general welfare. *Reginald D. v. State,* 193 Wis. 2d 299, 308, 533 N.W.2d 181 (1995). However, the state's police power is subject to limitations, and is not to be used in an unreasonable or excessive fashion, and, as such, is limited by the state and federal constitutions. *State v. Interstate Blood Bank, Inc.,* 65 Wis. 2d 482, 490, 222 N.W.2d 912 (1974). Other Wisconsin weapons laws have

---

[1] Wis. Const. art. I, § 25.

[2] *State v. Walls,* 190 Wis. 2d 65, 73, 526 N.W.2d 765 (Ct. App. 1994).

[3] *State v. Fry,* 131 Wis. 2d 153, 182, 388 N.W.2d 565 (1986).

[4] *Mularky v. State,* 201 Wis. 429, 432, 230 N.W. 76 (1930).

[5] *State v. Keith,* 175 Wis. 2d 75, 79, 498 N.W.2d 865 (Ct. App. 1993) (holding that the elements of the offense do not "requir[e] that a person actually *go* somewhere, and, therefore, carrying a concealed weapon 'does not necessarily import the idea of locomotion.' ") (citing 94 C.J.S. *Weapons* sec. 8a (1956)); Majority op., ¶ 24.

been more narrowly tailored, and, thus, do not suffer the same constitutional vulnerability as the one at hand here.[6] The state's police power cannot save a prohibition that sweeps as broadly as Wis. Stat. § 941.23.

¶ 105. Notwithstanding the majority's exceptions engrafted onto the statute, it logically extends to such a wide variety of scenarios that it leaves no " 'open ample alternative channels by which the citizen may exercise the right at issue.' " *Brandmiller v. Arreola,* 199 Wis. 2d 528, 541, 544 N.W.2d 894 (1996) (quoting *Lutz v. City of York, Pennsylvania,* 899 F.2d 255 (3d Cir.1990)). Logically extended, as the State conceded at oral argument, it prohibits a gun owner from storing his weapons out of plain sight, such as in a gun cabinet, closet, or drawer in his home. If such reasonable actions are foreclosed by the statute, owners of firearms and other dangerous weapons have been effectively, and significantly, deprived of the means by which they may exercise the constitutional right to bear arms for any lawful purpose.

¶ 106. Since, in my opinion, the statute is unconstitutional in light of the constitutional amendment, then making changes to it, so that the statute will be constitutional in the future, is the province of the legislature. Policy decisions affecting the statute's constitutionality should be made in typical legislative fashion. Public hearings and vigorous debate by members of the legislature are appropriate methods to employ when developing a law that is appropriate for the citizens of Wisconsin and within constitutional mandates. By its

---

[6] Wis. Stat. §§ 941.26 (machine guns), 941.28 (short-barreled shotguns and rifles), 941.29 (possession by a felon), 948.60 (possession by a minor), and 948.605 (possession in a school zone).

approach of attempting to engraft its exceptions onto the statute, the majority squelches this process.

¶ 107. The majority is correct in pointing out that among the six states that have a constitutional provision guaranteeing the right to bear arms, but do not allow any class of citizens to carry concealed weapons legally, Wisconsin is unique in the strictness of its prohibition. Majority op., ¶ 50. Wisconsin's carrying concealed weapons (CCW) law contains no exceptions. The other five states mentioned above have CCW laws that contain significant exceptions, the most common exception being for one's home or place of business.[7] The constitutional approach in Wisconsin that is proposed by the majority, rewriting the Wisconsin CCW law by this court, is not the way to adopt exceptions that allow Wisconsin citizens to exercise their rights reasonably.

¶ 108. Other state courts have recognized the state's police power to regulate the constitutional right to bear arms, but have also held that "the legitimate

---

[7] Ill. Comp. Stat. Ann. 5/24–1(a)(4) (2000) (" ... except when on his land or in his own abode or fixed place of business . . . ."); Kan. Stat. Ann. § 21–4201(a)(4) (1995) (" ... except when on the person's land or in the person's abode or fixed place of business."); Mo. Ann. Stat. § 571.030(3) (1995) (" . . . in his dwelling unit or upon business premises over which the actor has possession . . . ."); Neb. Rev. Stat. § 28–1202(2) (1995) (providing exception for when "the defendant was engaged in any lawful business, calling, or employment at the time he or she was carrying any weapon or weapons and the circumstances in which such person was placed at the time were such as to justify a prudent person in carrying the weapon or weapons for the defense of his or her person, property, or family."); Ohio Rev. Code Ann. § 2923.12(C) (1997) (providing exception for "going to or from the actors lawful business or occupation" and "while in the actor's own home.").

497

governmental purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the exercise of this right where the governmental purpose can be more narrowly tailored." *City of Princeton v. Buckner,* 377 S.E.2d 139 (W. Va. 1988). In many cases, courts have held a CCW statute or ordinance to be unconstitutional because it was unnecessarily broad. *See, e.g., City of Lakewood v. Pillow,* 501 P.2d 744 (Colo. 1972) (holding ordinance that prohibited possession or carrying of dangerous weapon violated right to bear arms); *Junction City v. Mevis,* 601 P.2d 1145 (Kan. 1979) (striking down gun-carrying ordinance as too broad); *State v. Delgado,* 298 Or. 395, 404, 692 P.2d 610, 614 (1984) (holding statute prohibiting the carrying of a switchblade too broad); *State v. Kessler,* 614 P.2d 94 (Or. 1980) (holding possession of a billy club in defendant's home protected by state constitution); *Glasscock v. City of Chattanooga,* 11 S.W.2d 678 (Tenn. 1928) (holding ordinance prohibiting carrying of pistol unconstitutional).

¶ 109. As an examination of other jurisdictions facing the same question shows, Wisconsin must modify its statutes in order that it does not, in effect, bar its citizens from legally exercising their right to bear arms, as described in Article I, Section 25 of our state constitution. This might be done by either: (1) Creating a licensing system by which certain qualified individuals are certified to carry concealed weapons; or (2) creating exceptions to Wis. Stat. § 941.23 that narrow the scope of the law to cover only certain reasonable time, manner and place restrictions on the carrying of concealed weapons. Only then will Wisconsin's CCW statute be insulated from the legitimate constitutional attack that it is too broad.

498

¶ 110. If this court were to strike down the current Wisconsin CCW statute, there would be legitimate concerns about the state of the law in this state during the interim, until the legislature could ·amend the statute to conform with the Wisconsin Constitution, as amended. However, the effective date of such a decision could be delayed, in order to provide the legislature sufficient time to enact the necessary amendments to the present law. *See Dep't of Corr. v. Kliesmet,* 211 Wis. 2d 254, 267, 564 N.W.2d 742 (1997) (delaying, for one year, the effective date of this court's decision limiting the authority of the Wisconsin Department of Corrections to house inmates in county jails over sheriffs' objections); *Holytz v. City of Milwaukee,* 17 Wis. 2d 26, 42, 115 N.W.2d 618 (1962) (delaying, for 40 days, the effective date of this court's decision abrogating the doctrine of governmental tort immunity).

¶ 111. The decision in the companion to this case, *State v. Cole,*[8] also includes a constitutional analysis of Wis. Stat. § 941.23, concluding that the statute is constitutional. I join the majority in that case, but only as to the mandate. I conclude that in *Cole,* the constitutional analysis is unnecessary because the defendant knowingly and intelligently entered a plea of guilty, thus waiving any claim of a constitutional violation. *Mack v. State,* 93 Wis. 2d 287, 293, 286 N.W.2d 563 (1980); *Edwards v. State,* 51 Wis. 2d 231, 186 N.W.2d 193 (1971); *State v. Biastock,* 42 Wis. 2d 525, 532, 167 N.W.2d 231 (1969). Thus, there was no need to consider the constitutional issue because of the waiver. *State v. Thomas,* 2000 WI 13, ¶ 16, 232 Wis. 2d 714, 726, 605 N.W.2d 836 (2000). *See also, State v. Bangert,* 131 Wis.

---

[8] *State v. Cole,* 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328.

2d 246, 389 N.W.2d 12. *See also State v. Minniescheske,* 127 Wis. 2d 234, 378 N.W.2d 283 (1985).

¶ 112. Lastly, I agree, also, with Chief Justice Abrahamson's determination that the majority improperly gives factual determinations to the judge to decide, as a matter of law, and not to the jury, concerning whether a defense is available to a defendant in a concealed weapon case. Majority op., ¶ 85, and Chief Justice Abrahamson's dissent, ¶ 132. It is for a jury to determine whether to believe defendant's version of events. *State v. Coleman,* 206 Wis. 2d 199, 214, 556 N.W.2d 701 (1996). The majority here requires the court, inappropriately, to weigh the evidence and make factual decisions relating to a constitutional defense against a CCW charge.

¶ 113. The majority in this case erroneously reads exceptions into Wis. Stat. § 941.23 rather than allowing the legislature to determine how to make the statute conform to the requirements of the constitution, as amended. I conclude that Wis. Stat. § 941.23 is unconstitutional now, because of the constitutional amendment adopted by Wisconsin's citizens. I would, in a delayed holding allowing time for the legislature to act, find the present statute unconstitutional, and, therefore, I respectfully concur since I agree with the majority's result that Hamdan's conviction should be reversed. However, I dissent on the majority's action in remanding this matter.

¶ 114. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting).* I conclude that Wis. Stat. § 941.23, prohibiting people from going armed with a concealed weapon, is constitutional as written and as applied. The Wisconsin constitution provides that "[t]he

people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose."[1] I therefore dissent.

¶ 115. The court should not rewrite Wis. Stat. § 941.23 to include exceptions for owners of "privately operated businesses" and persons in their "private residences."[2] If Wis. Stat. § 941.23 is unconstitutional because it is too broad, needing exceptions to render it constitutional, the court should strike the statute down and allow the legislature to enact a more narrow prohibition. We have often said that "courts cannot go beyond the province of legitimate construction to save [a statute], and where the meaning is plain, words cannot be read into it or out of it for the purpose of saving one or other possible alternative.[3] Moreover,

---

[1] Wis. Const. art. I, § 25.

[2] Majority op., ¶ 68.

[3] *State v. Hall,* 207 Wis. 2d 54, 82, 557 N.W.2d 778 (1997). As this court has explained:

[W]ere we to rewrite a statute whenever it failed constitutional muster in order to save it, using any means possible, the legislature would soon realize that it need not be concerned with constitutional limitations: the judiciary could always be relied upon to mend and mold its language to fit within constitutional constraints.

"While a statute should be held valid whenever by any fair interpretation it may be construed to serve a constitutional purpose, courts cannot go beyond the province of legitimate construction to save it, and where the meaning is plain, words cannot be read into it or out of it for the purpose of saving one or other possible alternative." It is well-established that "[w]here the language used in a statute is plain, the court cannot read words into it that are not found . . . even to save its constitutionality, because this would be legislation and not construction."

Finally, " '[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not

501

"defining the contours of laws subjecting a violator to criminal penalty is a legislative, not a judicial, function."[4]

¶ 116. The first part of this dissent explains that Wis. Stat. § 941.23 is constitutional as applied to the defendant here because it is a reasonable exercise of the State's police power, and it does not eviscerate the defendant's right to keep and bear arms for security. The second part of this dissent explains why the majority opinion errs when it gives courts the authority to determine, as a matter of law, that a given defendant may have a valid constitutional defense to a charge of carrying a concealed weapon, subject to a determination of lawful purpose by the finder of fact. Finally, I comment on the majority opinion's failure to appreciate the extent to which it has frustrated the ability of the legislature to set public policy on concealed weapons in Wisconsin.

I

¶ 117. Under *State v. Cole,* 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328, we are to presume that Wis. Stat. § 941.23 is constitutional, and we impose the heavy burden of proving that it is unconstitutional on

and will not carry this to the point of . . .' judicially rewriting it". "Otherwise, there would be no such thing as an unconstitutional statute."

*State v. Zarnke,* 224 Wis. 2d 116, 139–140, 589 N.W.2d 370 (1999) (citations omitted).

[4] *State v. Popanz,* 112 Wis. 2d 166, 177, 332 N.W.2d 750 (1983).

the challenger, the defendant in this case.[5] Any reasonable doubts about the statute must be resolved in favor of constitutionality.[6]

¶ 118. Furthermore, because the statute is an exercise of the State's police power, judicial review is limited to whether the exercise of that power is reasonable.[7] In reviewing the reasonableness of the statute, it is not for this court to pass judgment on the wisdom of the legislation. "Where legislative action is within the scope of the police power, fairly debatable questions as to reasonableness, wisdom, and propriety of action, are not for the determination of the court but for the legislative body."[8]

¶ 119. To determine whether Wis. Stat. § 941.23 is constitutional on the facts of this case we must ask two questions. The first question is whether the regulation on concealed weapons is a reasonable exercise of the police power, namely, does the statute promote public safety, health, or welfare and bear a reasonable

---

[5] *See State v. Cole,* 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328. I disagree with this court's conclusion in *Cole* that a statute enjoys a presumption of constitutionality when it is enacted before adoption of the constitutional amendment in issue. *Cole,* 264 Wis. 2d 520, ¶ 52 (Abrahamson, C.J., concurring). I would say instead that no presumption of constitutionality applies and the defendant in this case carries the burden of showing that the statute is inconsistent with the constitutional amendment.

[6] *Nankin v. Village of Shorewood,* 2001 WI 92, ¶ 10, 245 Wis. 2d 86, 630 N.W.2d 141 (citing *Aicher v. Wis. Patients Comp. Fund,* 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849).

[7] *State v. Jackman,* 60 Wis. 2d 700, 705, 211 N.W.2d 480 (1973).

[8] *State v. Dried Milk Prods. Co-op,* 16 Wis. 2d 357, 363, 114 N.W.2d 412 (1962).

relation to accomplishing those purposes.[9] The second question is whether the reasonable exercise of the state's police power eviscerates the constitutional right to bear arms.

¶ 120. No one disputes that the prohibition on carrying a concealed weapon is a reasonable exercise of the State's police power.[10] Wisconsin Stat. § 941.23 promotes public safety. The primary justification for the prohibition on carrying concealed weapons is that it protects the public by preventing an individual from having a deadly weapon on hand of which the public (including a law enforcement officer) is unaware, which may be used in the sudden heat of passion.[11] The public is safer, the argument goes, if it is able to take notice of those people who are carrying weapons and proceed accordingly. Indeed, in a case similar to the present case, *State v. Mata,* 199 Wis. 2d 315, 321, 544 N.W.2d 578 (Ct. App. 1996), the court of appeals concluded that a persuasive argument can be made that "a tavern owner's display of a handgun may deter crime while concealment of the gun probably would not."[12]

---

[9] *In Interest of Reginald D.,* 193 Wis. 2d 299, 308, 533 N.W.2d 181 (1995).

[10] As the majority opinion explains, Wisconsin's prohibition of the carrying of concealed weapons is not only a reasonable exercise of police power but also serves many valuable purposes in promoting public safety. Majority op., ¶ 53.

[11] Majority op. ¶¶ 54–56; *see also State v. McAdams,* 714 P.2d 1236, 1238 (Wyo. 1986).

[12] The majority opinion dismisses this analysis as suspect in light of Article I, Section 25, *see* majority op., ¶ 72 n.32, yet nothing about the constitutional amendment changes the reasonableness or persuasiveness of the bald argument that openly displaying a handgun may deter crime while concealment probably would not.

¶ 121. Moreover, by making it a misdemeanor to carry a concealed weapon, Wis. Stat. § 941.23 bears a reasonable and substantial relationship to the end of promoting public safety. Criminalizing conduct stigmatizes conduct and deters people from doing it, a conclusion the majority opinion agrees with as well.[13]

¶ 122. The second question in the present case is whether the reasonable exercise of the State's police power eviscerates the constitutional right to bear arms.[14] As the majority opinion explains, an otherwise reasonable exercise of police power cannot be invoked in a way that "eviscerates," "destroys," "frustrates," or "nullifies" the constitutional right to bear arms.[15] Short of that, however, as the majority opinion further explains, the right to bear arms is not absolute and is subject to reasonable regulation.[16]

¶ 123. In order to determine whether a statute eviscerates a constitutional right or merely reasonably regulates a constitutional right we must examine the "degree" to which the regulation frustrates the purpose of the constitutional right.[17] For example, in *City of Seattle v. Montana,* 919 P.2d 1218 (Wash. 1996), the

---

[13] Majority op., ¶ 56.

[14] Majority op., ¶ 39.

[15] Majority op., ¶¶ 40–41.

[16] Majority op., ¶ 45.

[17] *City of Seattle v. Montana,* 919 P.2d 1218, 1224 (Wash. 1996) (citing *Second Amendment Found. v. City of Renton,* 668 P.2d 596 (Wash. Ct. App. 1983)); *see also State v. Boyce,* 658 P.2d 577, 579 (Or. Ct. App. 1983) (regulation requiring people on a public street or in a public place to remove ammunition from their firearms is constitutional because it only regulates manner and does not unreasonably hinder right to bear arms); *State v. Kessler,* 614 P.2d 94, 99–100 (Or. 1980) (total prohibition on possession of billy clubs in all places is unconstitutional).

Washington Supreme Court upheld a city ordinance regulating the carrying and possession of "dangerous knives" in the face of a constitutional amendment granting the right to bear arms. The court reasoned that the police power was reasonably exercised to "promote public safety and good order," and that the city did not enact a "complete prohibition on possession and carrying knives" but merely "regulated the carrying, transport, and use of knives."[18] Therefore, the statute was constitutional.[19]

¶ 124. Wisconsin Stat. § 941.23 is similarly constitutional when applied to the defendant because it does not eliminate the right of an owner of a privately operated business to bear arms for security or defense but simply limits the manner in which he or she may exercise the right to bear arms. That is, § 941.23 does not prevent anyone from carrying a firearm for security, defense, hunting, recreation, or other lawful purposes.

---

[18] *Seattle,* 919 P.2d at 1225.

[19] Similarly, in *People v. Blue,* 544 P.2d 385 (Colo. 1975), the Colorado Supreme Court concluded that a statute making it a felony for ex-offenders to possess, use, or carry a weapon was a reasonable exercise of the State's police power despite a state constitutional right to bear arms. The Court explained: (1) the statute is a legitimate exercise of the police power; (2) the legislature cannot enact laws in the name of police powers that "render nugatory [the] Bill of Rights and other constitutional protections"; but (3) a statute that "simply limits the possession of guns and other weapons by persons who are likely to abuse such possession" does not eviscerate a constitutional protection. *Id.* at 391.

*See also Arnold v. Cleveland,* 616 N.E.2d 163, 173 (Ohio 1993) (legislation survived constitutional scrutiny because the regulation achieved its goal of protecting the public by "limit-[ing] the accessibility of certain generally recognized dangerous firearms").

Rather, it limits the manner of carrying weapons, by requiring that a weapon that is on a person or within a person's reach not be concealed.[20] The gist of the offense is the concealment. Thus, nothing about Wis. Stat. § 941.23 comes close to eviscerating, destroying, frustrating, or nullifying the right to bear arms in Wisconsin for the defendant here or any other person. The right to bear arms "is not impaired by requiring individuals to carry weapons openly."[21]

¶ 125. The majority opinion reaches a different answer to this second question. The majority opinion concludes that prohibiting an owner of a privately operated business from carrying concealed weapons for purposes of security renders meaningless the right to bear arms.[22]

¶ 126. The majority opinion's contrary conclusion results from the fact that it goes beyond an examination of the degree to which the right is restricted and instead weighs the merits of the policy supporting Wis. Stat. § 941.23 as a reasonable exercise of the State's police power when applied to the owner of a privately operated business. The majority opinion concludes, for

---

[20] *See* majority op., ¶ 46.

[21] *Dano v. Collins,* 802 P.2d 1021, 1022–23 (Ariz. Ct. App. 1990).

*See also Cole,* 264 Wis. 2d 520, ¶ 49 ("[T]he right to bear arms is clearly not rendered illusory by prohibiting an individual from keeping a loaded weapon hidden either in the glove compartment or under the front seat in a vehicle."). The distinction between as applied and facial challenges is a difficult one to make. The distinction apparently arose in First Amendment cases, and its usefulness in other cases has troubled courts and scholars. *See Schultz v. Natwick,* 2002 WI 125, ¶ 20 n.19, 257 Wis. 2d 19, 653 N.W.2d 266.

[22] Majority op., ¶ 68.

example, that a person is less likely to "act on impulse" or in the heat of passion "in a familiar setting in which the safety and satisfaction of customers is paramount and the liability for mistake is nearly certain."[23] The majority also concludes that "[a] shopkeeper is not likely to use a concealed weapon to facilitate his own crime of violence in his own store."[24] Finally, the majority opinion asserts that there is less need in these circumstances for innocent customers to be notified that the owner of a business possesses a weapon—anyone who enters a business premises "should presume that the owner possesses a weapon, even if the weapon is not visible."[25]

¶ 127. In short, the majority opinion engages in its own consideration of public policy and promulgates its own views of human psychology to reach its conclusion that Wis. Stat. § 941.23 is unconstitutional as applied to an owner of a privately operated business without the benefit of any facts or reasoned debate on the matter or giving credence to the legislature's determination of public policy or views about human psychology.[26]

¶ 128. The majority opinion's consideration of policy and psychology is in error. First, the majority's conclusions are unpersuasive. It seems equally plausible to argue that a person will act less rationally and more impulsively in defending his or her own privately

---

[23] Majority op., ¶ 57.

[24] *Id.*

[25] *Id.*

[26] *See* majority op., ¶ 74 ("Requiring a storeowner to openly display weapons as the only available means of exercising the right to keep and bear arms for security is impractical, unsettling, and possibly dangerous.").

508

owned business (a familiar place) because the person's interest in security is so strong and the feeling of violation from any breach in that security is so great. Likewise, there is no evidence that a crime of violence is less likely for a shop owner in his own store. A shop owner who has a gun and is frightened, intimidated, or threatened is more likely to use it, and as the Wyoming Supreme Court concluded in upholding its own concealed weapon law, "it is not always necessary, *nor is it always lawful,* to use deadly force in one's own defense."[27] Finally, it is equally plausible to conclude that the privately operated business is a "public place," that customers will be exposed to the danger of a concealed weapon in public places, and a business owner's right to carry a concealed weapon for security is outweighed by the needs of public safety.[28]

¶ 129. Second, and more importantly, the majority's dubious conclusions are irrelevant. The stat-

---

[27] *McAdams,* 714 P.2d at 1238 (quoting *Garcia v. State,* 667 P.2d 1148 (Wyo. 1983)) (emphasis added).

[28] *See* majority op., ¶ 63 (quoting Ruby B. Weeks, Annotation, *Scope and Effect of Exception, in Statute Forbidding Carrying of Weapons, as to Person on His Own Premises or at His Place of Business,* 57 A.L.R. 3d 938, § 2(a) (1974) (recognizing the danger of a concealed weapon in place where there is contact with the public)).

The majority opinion's conclusion that everyone should presume an owner of a privately operated business is carrying a concealed weapon is also dubious in the face of the majority opinion's contrary conclusion that carrying a gun openly is unreasonable since it "would alert criminals to the presence of the weapon and frighten friends and customers." Majority op., ¶ 73. Why is it reasonable and not frightening for customers to presume that all owners of a privately operated business are carrying a concealed weapon but frightening and unreasonable to permit the owner to carry that weapon openly?

ute is presumed constitutional and the burden on the challenger is heavy. By enacting the statute the legislature has determined that public safety is advanced when owners of privately operated businesses, like all other individuals, are required to carry their guns openly. Although the majority opinion has set forth counter-arguments to the legislature's determination that concealed weapons are hazardous to public safety, neither the majority opinion nor the challenger has carried the heavy burden of demonstrating that the legislative determination is unconstitutional because the degree to which it restricts the right to bear arms for owners of privately operated businesses eviscerates the constitutional right.

## II

¶ 130. While I conclude that Wis. Stat. § 941.23 is constitutional as applied, I write further because I believe that the majority also errs when it parcels out between judge and jury the questions necessary for determining whether its newly created constitutional defense to a charge of carrying a concealed weapon is available to a defendant.

¶ 131. The majority opinion concludes that a defendant who challenges a prosecution for carrying a concealed weapon on constitutional grounds will be required to secure affirmative answers to two "legal questions" for the circuit court before he is entitled to raise a constitutional defense and one question of fact for the fact finder at trial before he may prevail.[29] The two legal questions for the circuit court are: (1) did the defendant's interest in concealing the weapon substantially outweigh the State's interest in enforcing the

[29] Majority op., ¶ 86.

concealed weapons statute; and (2) was concealment the only reasonable means under the circumstances to carry the gun.[30] Then, according to the majority opinion, if the defendant receives affirmative answers to these two questions the trier of fact must determine by means of a separate verdict question whether the defendant had a lawful purpose for carrying the weapon.[31]

¶ 132. It is unclear to me why the questions are so divided. First, it is well established in Wisconsin law that a court commits error by refusing to give a theory of defense instruction to the jury when a defendant presents sufficient evidence in support of the defense. When deciding whether a defendant is entitled to assert a defense, a court does not weigh the evidence. It asks only whether a reasonable construction of the evidence, viewed most favorably to the defendant supports the alleged defense. A court may refuse the defendant's request for an instruction only when there is no evidence to support it.

¶ 133. Moreover, in cases involving claims that a criminal prosecution impermissibly infringes upon a constitutionally protected right, it is typically the jury that determines whether the constitutional defense is available to the defendant. For example, a person is prosecuted under Wis. Stat. § 944.21(4) (1995–96) for distributing obscene materials. The statute defines obscene material to exclude materials protected by the First Amendment. The court instructs the jury, defining

---

[30] *Id.*

[31] *Id.,* ¶¶ 78, 86–87.

what is protected First Amendment free speech, and the jury decides whether the constitutional defense is available.[32]

¶ 134. In addition, Wis. Stat. § 940.203(2) (1997–98) penalizes a person who threatens a judge. To render the statute constitutional against a First Amendment challenge, the court defined the threat in the statute to cover only "true threats" in order to render the statute constitutional. A jury is instructed regarding the definition of "true threat" so that the jury can decide whether the facts fall within the statute or the prosecution is barred by the First Amendment.[33]

¶ 135. On the basis of these cases, which are, in my opinion, substantially similar to the case at bar, I question the majority opinion's excluding the jury from decision-making regarding guilt in the present case. Here we have a statute prohibiting the carrying of a concealed weapon. The court has read in a constitutional limitation. The majority opinion appears to turn our precedent on its head when it permits a court, not the jury, to reach substantive conclusions about the merits of a defendant's constitutional defense to a charge of carrying a concealed weapon when reasonable people might disagree. It seems to me that the majority opinion reverses well-established law when it concludes that a defendant must persuade a court as a matter of law that his defense is meritorious before his defense is presented to the jury. Under the majority opinion, when reasonable people could differ about the availability of

---

[32] *See County of Kenosha v. C&S Mgmt., Inc.,* 223 Wis. 2d 373, 588 N.W.2d 236 (1999); *see also McCauley v. Tropic of Cancer,* 20 Wis. 2d 134, 137, 121 N.W.2d 545 (1963) (a jury trial on issue of obscenity under the statute).

[33] *State v. Perkins,* 2001 WI 46, 243 Wis. 2d 141, 626 N.W.2d 762.

the defense on the basis of the facts presented, a court is able to bar a defendant's defense.

¶ 136. A court may direct only an acquittal as a matter of law. Indeed, this court determines in the present case not just that the defendant was entitled to raise a constitutional defense in the present case but that he prevails in his defense as a matter of law. The majority opinion concludes that the defendant's conviction was unconstitutional and must be reversed unless the State can prove that the defendant carried a concealed weapon for an unlawful purpose.[34]

¶ 137. Second, assuming for the sake of argument that these two questions are properly questions of law for the court, it is unclear why the remaining question of lawful purpose is left to the jury.[35] The majority opinion concludes that whether a defendant has an unlawful purpose for bearing a concealed weapon is a question of fact because "it may involve a state of mind for which competing evidence is necessary."[36] Will there not be competing evidence going to the defendant's interest in concealing the weapon, the State's interest

---

[34] Majority op., ¶ 84.

[35] It is also unclear what it means to have a lawful purpose. The majority opinion explains that "carrying a concealed weapon for an unlawful purpose means carrying a concealed weapon in furtherance of the commission of a crime. Majority op., ¶ 77. What if there are two purposes for a person to conceal his weapon, one criminal and the other "for security"? What if the purpose is lawful but some other fact makes the concealment unlawful, such as the fact that the weapon carrier is an ex-felon?

[36] Majority op., ¶ 76.

in enforcing the statute,[37] or whether concealment was the only reasonable means under the circumstances to carry the gun? I recognize that a person's state of mind is typically a factual determination, but so is reasonableness. The majority opinion does not explain why lawful purpose (question three) is for the jury but not whether there is a reasonable alternative to concealing the weapon (question two).[38]

¶ 138. As an aside, I am puzzled about where the majority finds the requirement in the constitutional amendment that the purpose be lawful if the individual satisfies the circuit court that he had the weapon for security purposes. The majority opinion reads the constitutional amendment as requiring a person to carry the concealed weapon for security *and* for a lawful purpose. In so doing, the majority opinion is using the catchall in the constitution, "and any other lawful purpose" to restrict the word "security" preceding it. This requirement of "lawful purpose" seems to unduly restrict the constitutional amendment's application contrary to its terms. "There is no purpose for the presence of [the catchall phrase] except to expand the list of potential qualifying" purposes.[39]

---

[37] The majority opinion never addresses whether the State's interests in enforcing the statute are established conclusively by this opinion or will vary from case to case.

[38] Justice Bablitch's concurrence analogizes the circuit court's role under the majority opinion's framework to the circuit court's role in determining constitutional facts under a Fourth Amendment case. Justice Bablitch's concurrence, ¶ 96. In the Fourth Amendment context, however, as the concurrence admits, all questions regarding reasonableness are for the court.

[39] *State v. Peters,* 2003 WI 88, ¶ 23, 263 Wis. 2d 475, 665 N.W.2d 171.

¶ 139. Third, a court's determinations that the defendant's interest in concealing a weapon substantially outweighs the State's interest in enforcing the concealed weapons statute (question one) and that concealment is the only reasonable means under the circumstances to carry a weapon (question two) are necessarily intertwined with a determination that the defendant carried a concealed weapon for a lawful purpose. Thus, when a court determines that a constitutional defense may be raised it effectively nullifies the remaining question that the majority opinion reserves for a jury.

¶ 140. In the present case, for example, the court's conclusion that the defendant's interest in maintaining a concealed weapon substantially outweighs the State's interest in prohibiting concealed weapons is expressly premised on the fact that the defendant possessed and carried his weapon "for purposes of security."[40] The majority opinion holds: "If the constitutional right to bear arms *for security* is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence or privately operated business, and to safely move and store weapons within these premises."[41] A jury finding that the defendant carried a concealed weapon for an unlawful purpose plainly contradicts the applicability of this legal conclusion to the present case.

---

[40] Majority op., ¶ 67. In the same vein, the majority recites the facts of the case as follows: "As a result of these general and specific concerns for the safety of himself, his family, and his customers, and for the security of his property, [the defendant] kept a handgun under the store's front counter next to the cash register during store hours." Majority op., ¶ 9.

[41] Majority op., ¶ 68 (emphasis added).

## III. COMMENTARY

¶ 141. The majority opinion suggests that the legislature needs to "clarify the law" on carrying concealed weapons in light of the new constitutional right to keep and bear arms for security, defense, hunting, recreation, and any other lawful purpose.[42] At the same time, it adopts principles of constitutional law for courts to use in determining whether a person has a constitutional defense to a charge of carrying a concealed weapon "until the legislature takes further action."[43]

¶ 142. In so doing, the majority opinion fails to appreciate two important points.

¶ 143. First, the legislature's intent in the statute to prohibit the carrying of concealed weapons in all places is clear. The history of the constitutional amendment is replete with evidence that the amendment was not intended to abrogate existing statutory regulation of firearms. As this court acknowledged in *Cole*, the legislative history behind the constitutional amendment granting the right to bear arms in Wisconsin "clearly suggests that the legislature did not intend to repeal reasonable gun laws such as the CCW statute."[44]

¶ 144. The intent of the amendment was to prevent further erosion of the rights of gun owners, referring to local ordinances regulating guns.[45] In addition, according to a public opinion poll at the time of

---

[42] Majority op., ¶ 85.

[43] Majority op., ¶ 89.

[44] *Cole,* 264 Wis. 2d 520, ¶ 39.

[45] *Cole,* 264 Wis. 2d 520, ¶ 64 (Prosser, J., concurring).

the amendment, almost 80% of Wisconsinites opposed legalizing the carrying of concealed weapons.[46]

¶ 145. Second, the majority opinion has erected constitutional roadblocks to any further action the legislature might take to determine public policy on concealing firearms and other weapons. The constitutional right to bear arms in Wisconsin now includes a right not only for all owners of privately owned and operated businesses and persons in their private residences to carry concealed weapons for purposes of security, but for many others as well. The majority not only concludes that for the right to bear arms to mean anything it must mean that a person can conceal arms to "maintain the security of his private residence or privately operated business,"[47] but also that the constitutional right to bear arms in Wisconsin further protects the right of any other person to carry a concealed weapon if a *court* determines that the person's interest in carrying a concealed weapon "substantially outweighs" the State's interest in enforcing the concealed

---

[46] *Cole,* 264 Wis. 2d 520, ¶ 44 (citing Jeffrey Monks, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right To Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 284).

[47] Majority op., ¶ 68. Despite its attempts to limit the present holding to the defendant's precise circumstances, the language in the majority opinion is much broader. For example, the majority opinion concludes, "[I]f the State prosecutes a storeowner for having a concealed weapon within easy reach, it is strongly discouraging the use of firearms for security and is practically nullifying the right to do so." Majority op., ¶ 74. This language is hardly limited to the facts of this case.

weapons statute.[48] The number of individuals who can fit under the umbrella is large.

¶ 146. More importantly, when any court concludes that an individual is exempted from the prohibition on carrying a concealed weapon under this "substantially outweighs" test, the court is determining that the constitution demands the exception. The legislature may not undo the court's determination absent another constitutional amendment.

¶ 147. The majority opinion concludes, "We happily concede that the legislature is better able than this court to determine public policy on firearms and other

[48] The two questions the majority opinion establishes for determining whether a constitutional defense is available are broad sweeping and potentially apply to countless individuals under any number of circumstances.

For example, an owner of a privately operated business caught carrying a concealed weapon while walking to deposit the store's earnings in a bank can certainly argue that he is exercising his right to keep and bear arms under circumstances in which the need to exercise the right is substantial and that concealment, while walking to and upon entering the bank, is the only reasonable means for exercising the right to bear arms under the circumstances. So too can a store manager in charge for an absentee owner argue that she is exercising her right to keep and bear arms under circumstances in which the need to exercise the right is substantial and that concealment is the only reasonable means for exercising the right. Indeed, what is to stop any person from claiming this right in his or her workplace?

Similarly, anyone who must walk home from a bus stop every night after work through a high crime neighborhood can surely argue that his or her need to exercise the right to bear arms is high, concealment is necessary, and that his or her interests in self-protection substantially outweigh the State's interest in regulating concealed weapons.

weapons."[49] Unfortunately, the majority's recognition of its inferior ability did not dissuade it from reading two exceptions into the carrying concealed weapons statute and setting forth criteria for reading additional exceptions into the statute, effectively blocking the legislature from determining public policy concerning concealed weapons.

¶ 148. For the foregoing reasons, I dissent.

---

[49] Majority op., ¶ 85.